In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 24-2111

IN RE: HARLEY-DAVIDSON AFTERMARKET PARTS MARKETING, SALES PRACTICES AND ANTITRUST LITIGATION

EDWARD HEYMER, *et al.*,

*Plaintiffs-Appellants*

*v.*

HARLEY-DAVIDSON MOTOR COMPANY GROUP, LLC and HARLEY-DAVIDSON MOTOR COMPANY, INCORPORATED,

*Defendants-Appellees.*

---

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 23-MD-3064 — **William C. Griesbach**, *Judge.*

---

ARGUED DECEMBER 10, 2024 — DECIDED AUGUST 15, 2025

---

Before KIRSCH, LEE, and KOLAR, *Circuit Judges.*

KIRSCH, *Circuit Judge.* Harley-Davidson offers customers a limited warranty when they purchase a new motorcycle. Among other terms and conditions, Harley-Davidson limits warranty coverage when non-Harley-Davidson parts are

installed in the motorcycle. Edward Heymer and 14 other customers received this limited warranty when they purchased their motorcycles. Fearing that non-Harley-Davidson parts would void their warranties, they purchased higher-priced Harley-Davidson parts instead. They then sued, claiming the company's warranty practices violate multiple provisions of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq., and various state antitrust laws by conditioning warranty coverage on the exclusive use of Harley-Davidson parts. We conclude that the district court properly dismissed their complaint for failure to state a claim.

The Warranty Act imposes both disclosure and content obligations on warrantors. Heymer alleges that Harley-Davidson's warranty violates the Warranty Act's anti-tying, disclosure, and pre-sale availability provisions. But the terms of the limited warranty do not create an express or implied tie, which is necessary to make out a claim under the Warranty Act's anti-tying provision. Nor does the complaint plausibly allege a violation of the disclosure provision, as it fails to identify any standards or terms that were not fully disclosed in the text of the warranty itself. And, finally, the complaint's bare assertion that Harley-Davidson does not provide signs with warranty terms to dealers does not suffice to allege noncompliance with the pre-sale availability rule.

Heymer's antitrust claims likewise fail. The complaint accuses Harley-Davidson of illegal tying, attempted monopolization, and creating a *Kodak*-style lock-in by conditioning continued warranty coverage on the use of Harley-Davison parts. But Heymer cannot make out a tying or attempted monopolization claim because the complaint fails to plausibly allege that Harley-Davidson exercises sufficient economic power in

either the relevant market for motorcycles or the aftermarket for compatible parts. The complaint also fails to allege information or switching costs that would enable Heymer to make out a plausible *Kodak*-style lock-in claim. For these reasons, we affirm.

I

This appeal arises out of a motion to dismiss, so we accept the well-pleaded facts in the complaint, recounted below, as true. *Boogaard v. Nat'l Hockey League*, 891 F.3d 289, 290 (7th Cir. 2018). "That does not mean, however, that we vouch for their accuracy." *Id.* at 290–91. And to the extent the allegations in the complaint are contradicted by the terms of the limited warranty, the warranty's language controls. See *Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 466 (7th Cir. 2007). Although the plaintiffs did not attach copies of their limited warranties to the complaint, copies were included in the motion to dismiss. Because the limited warranty is referred to in the complaint and central to the plaintiffs' claims, we can consider it under the incorporation-by-reference doctrine. *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012).

A

Harley-Davidson Motor Company Group, LLC and Harley-Davidson Motor Company, Inc. (collectively, Harley-Davidson) manufacture and sell motorcycles to consumers throughout the United States. It is one of only a few American motorcycle brands and the most popular one by far. The company is known for its large, roadgoing motorcycles, which have greater passenger and cargo capacity than smaller motorcycles. Harley-Davidson markets itself as an all-

American brand and appeals to consumers that seek to celebrate their shared national heritage through their motorcycles. The company's marketing effort has largely been successful in cultivating a loyal following. Harley-Davidson captures one-fifth of the domestic market for large, roadgoing motorcycles—the largest market share of any brand. Five foreign brands make up another half of the market. The market for the next largest American brand, Indian Motorcycle Inc., is small by comparison—no more than one-sixth the size of Harley-Davidson's.

Apart from motorcycles, Harley-Davidson also manufactures and sells motorcycle parts and accessories. Because Harley-Davidson owners are willing to keep their motorcycles on the road for generations, the demand for parts to repair and customize Harley-Davidson motorcycles is substantial. About 15 percent of the company's revenue comes from selling parts. And there is a robust marketplace of suppliers offering parts and accessories compatible with Harley-Davidson motorcycles, giving customers a wide variety from which to choose. Still, Harley-Davidson is the largest supplier of parts compatible with its motorcycles.

In addition to selling parts, Harley-Davidson also supplies them to customers as part of its limited warranty program. Under the terms of the limited warranty, an authorized Harley-Davidson dealer will repair or replace any defective part on a customer's new motorcycle without charge for up to 24 months. However, the limited warranty comes with certain conditions and limitations on its coverage. For example, the warranty does not cover defects or damage caused by parts or accessories that are not approved for the motorcycle, or damage caused using non-Harley-Davidson components.

Although the limited warranty is included in the owner's manual as its own, discrete section, it also references other parts of the owner's manual. For example, the limited warranty says the motorcycle must be operated and maintained as specified in the owner's manual. Then, in a section of the owner's manual titled "Warranties and Responsibilities," Harley-Davidson explains that the owner must follow the maintenance schedule in the owner's manual to keep the limited warranty valid. This section also includes the following statements:

> Use only Harley-Davidson approved parts and accessories that have been designed, tested and approved for your model and model year motorcycle.

> Use of aftermarket performance parts may void all or parts of your limited warranty. See an authorized Harley-Davidson dealer for details.

> ….

> Genuine Harley-Davidson parts are engineered and tested specifically for use on your motorcycle. Insist that your authorized Harley-Davidson dealer uses only genuine Harley-Davidson replacement parts and accessories to keep your Harley-Davidson motorcycle and its limited warranty intact. Not all Harley-Davidson parts and accessories are appropriate for your model or model year motorcycle.

> ….

> Installing off-road or competition parts to enhance performance may void all or parts of your

limited warranty. See the Harley-Davidson Mo-
torcycle Limited Warranty in this owner's man-
ual or an authorized Harley-Davidson dealer
for details.

And in the section of the owner's manual that outlines the
maintenance schedule, Harley-Davidson again cautions that
the use of parts and service procedures other than those ap-
proved by Harley-Davidson may void the limited warranty.

B

In 2022, the Federal Trade Commission issued a complaint
against Harley-Davidson for its warranty practices. The
agency alleged that the company violated the Magnuson-
Moss Warranty Act (the Warranty Act), 15 U.S.C. § 2301 et
seq., by unlawfully conditioning its limited warranty on the
exclusive use of Harley-Davidson parts and accessories and
by failing to properly disclose all the terms of its warranty in
a single document. Harley-Davidson settled with the FTC and
entered into a consent decree that required the company to
change its warranty practices.

Around the same time, Edward Heymer and several other
customers sued Harley-Davidson, raising similar complaints.
The United States Judicial Panel on Multidistrict Litigation
transferred these suits to the Eastern District of Wisconsin for
consolidated pretrial proceedings. In the operative consoli-
dated complaint, Heymer and 14 other named plaintiffs (col-
lectively, Heymer) allege that they received limited warran-
ties from Harley-Davidson when they purchased their motor-
cycles. Fearing that the use of non-Harley-Davidson parts
would void his warranty, Heymer says he purchased higher-
priced Harley-Davidson parts instead. Heymer claims that

Harley-Davidson's warranty practices violate the Warranty Act and various state laws. He seeks to represent a class of Harley-Davidson consumers who are similarly situated.

Harley-Davidson moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss the consolidated class action complaint for failing to state a claim, which the district court granted. The district court found that the limited warranty did not condition the benefits of the warranty on the use of Harley-Davidson parts or otherwise state a viable claim under the Warranty Act. The district court also held that the risk of losing warranty coverage is not in itself sufficient to make out an anticompetitive tying arrangement or economic forcing claim under state antitrust law. Because the other state law claims were premised on the same anticompetitive behavior, the district court dismissed them as well. This appeal followed. We review the dismissal of Heymer's claims de novo. *Hagan v. Quinn*, 867 F.3d 816, 820 (7th Cir. 2017).

II

Before turning to the merits, we must first assure ourselves that this action can be heard in federal court. See *Yancheng Shanda Yuanfeng Equity Inv. P'ship v. Wan*, 59 F.4th 262, 268 (7th Cir. 2023). We agree with the parties that the district court had diversity jurisdiction over the state law claims under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d). There are at least 100 members in the proposed class, their claims collectively exceed five million dollars, and some class members are citizens of a different state than Harley-Davidson. *Id.* § 1332(d)(2), (5)(B), (6). The Warranty Act claims present a more difficult question. Usually, the federal question jurisdiction statute, *id.* § 1331, would provide the basis for the district court's jurisdiction over federal claims. But the Warranty Act

includes additional criteria that limit district courts' authority to exercise federal question jurisdiction. *Ware v. Best Buy Stores, L.P.*, 6 F.4th 726, 731 (7th Cir. 2021). Relevant here, it provides that class actions cannot be brought in federal court if the number of named plaintiffs is less than 100. 15 U.S.C. § 2310(d)(1)(B) & (3)(C). There are only 15 named plaintiffs in this action.

The parties suggest that the Warranty Act's jurisdictional limitation is irrelevant because the district court could exercise jurisdiction under CAFA, which does not require 100 named plaintiffs. Courts are split on how to resolve the conflicting class requirements of CAFA and the Warranty Act. The Third and Ninth Circuits have held that CAFA does not apply to Warranty Act claims, reasoning that if it did then CAFA would effectively repeal by implication the Warranty Act's more restrictive criteria. *Floyd v. Am. Honda Motor Co.*, 966 F.3d 1027, 1034–35 (9th Cir. 2020); *Rowland v. Bissell Homecare, Inc.*, 73 F.4th 177, 183–85 (3d Cir. 2023). In an unpublished opinion, the Sixth Circuit took the opposite approach, holding that "CAFA effectively supersedes the [Warranty Act]'s more stringent jurisdictional requirements" in part because it is "the more recent of the two statutes." *Kuns v. Ford Motor Co.*, 543 F. App'x 572, 574 (6th Cir. 2013). Other courts have held that the Warranty Act's jurisdictional limitations restrict federal question jurisdiction, but do not affect diversity jurisdiction. E.g., *In re Generac Solar Power Sys. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 735 F. Supp. 3d 1036, 1043–45 (E.D. Wis. 2024).

We have yet to resolve the jurisdictional interplay between the Warranty Act and CAFA. See *Ware*, 6 F.4th at 733 n.2. Nor must we in this case. Because the Warranty Act claims arise

out of the same controversy as the state law claims, the district court could have exercised supplemental jurisdiction over the Warranty Act claims. 28 U.S.C. § 1367(a); *Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516, 522 (7th Cir. 2003). And once we determine that the district court could have exercised supplemental jurisdiction over a claim it decided on the merits, "the existence of federal jurisdiction over that claim is established and our review is limited to whether the district court's discretion was abused." *Voelker*, 353 F.3d at 522. Here, neither party objected to the district court's "de facto exercise of its supplemental jurisdiction." *Id.* Having assured ourselves of jurisdiction, we turn next to the merits of the Warranty Act claims.

## III

Prior to the passage of the Warranty Act, product warranties were often "too complex to be understood, too varied to allow meaningful comparisons and too restricted to provide meaningful warranty protection." *Skelton v. Gen. Motors Corp.*, 660 F.2d 311, 314 (7th Cir. 1981). To remedy this, the Warranty Act imposed certain disclosure requirements and minimum content standards on warrantors like Harley-Davidson. *Id.* These provisions "improve the adequacy of information available to consumers, prevent deception, and improve competition in the marketing of consumer products." 15 U.S.C. § 2302(a). Three provisions are relevant here: § 2302(c), (a), and (b).

## A

First, § 2302(c) precludes warrantors from conditioning a warranty on the consumer's use of an article or service identified by brand name unless the article or service is provided

free of charge. This anti-tying provision prohibits conditions like: "This warranty is void if service is performed by anyone other than an authorized 'ABC' dealer and all replacement parts must be genuine 'ABC' parts." 16 C.F.R. § 700.10(c).[1] But it does not prevent a warrantor from excluding warranty coverage for defects or damage caused by using unauthorized parts or services. *Id.*

Heymer alleges that certain statements in Harley-Davidson's owner's manual violate the Warranty Act's anti-tying provision, including: "Use only Harley-Davidson approved parts and accessories that have been designed, tested and approved for your model and model year motorcycle. Use of aftermarket performance parts may void all or parts of your limited warranty." "Insist that your authorized Harley-Davidson dealer uses only genuine Harley-Davidson replacement parts and accessories to keep your Harley-Davidson motorcycle and its limited warranty intact." And: "The use of parts and service procedures other than Harley-Davidson approved parts and service procedures may void the limited warranty."

---

[1] The FTC's regulatory guidance is only "advisory in nature" and "do[es] not have the force or effect of statutory provisions." Magnuson-Moss Warranty Act: Interpretations and Explanatory Statement, 42 Fed. Reg. 36111, 36112 (July 13, 1977). But where, like here, an agency interpretation is issued shortly after a statute's passage and remains consistent over time, it is entitled to great respect. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385–86 (2024); see also *Miller v. Herman*, 600 F.3d 726, 733–34 (7th Cir. 2010) (giving *Skidmore* deference to the FTC's interpretations of the Warranty Act). Neither party disputes the persuasive authority of § 700.10(c).

These statements are neither in the limited warranty nor
purport to modify or supplement its terms. Instead, they
simply offer a general warning to consumers that using unau-
thorized parts in their motorcycles *may* void the warranty and
advise them to avoid doing so. Such cautionary language
does not run afoul of § 2302(c). To understand when using
unauthorized parts *will* void the limited warranty, consumers
can refer to the actual terms of the warranty. Had Heymer
done so, he would have seen that unauthorized parts void the
warranty when they cause defects or damage to the motorcy-
cle or cause a Harley-Davidson part to fail. These are not the
kinds of conditions that violate § 2302(c). See 16 C.F.R.
§ 700.10(c).

It is true that the limited warranty says customers must
operate and maintain their motorcycles as specified in the
owner's manual, which indicates that statements made in
other sections of the owner's manual can also affect the valid-
ity of the warranty. But when that is the case, the owner's
manual says so expressly (e.g., "All of the specified mainte-
nance services *must be* performed on schedule to keep your
limited warranty valid." "The performance of new motorcy-
cle initial service *is required* to keep your new motorcycle war-
ranty in force …") (emphases added). The cautionary state-
ments Heymer asks us to consider lack such unambiguous
language.

We are cognizant of the fact that the FTC issued a com-
plaint alleging that Harley-Davidson's warranty practices vi-
olate § 2302(c). However, allegations made by the FTC in a
complaint reflect "a threshold determination that further in-
quiry is warranted and that a complaint should initiate pro-
ceedings" rather than "a definitive statement of position."

*FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 241 (1980). That is not the kind of informed agency judgment we look to for guidance when interpreting a statute. *Loper Bright Enters.*, 603 U.S. at 394.

In the alternative, Heymer contends that even if these statements do not create an actual tie, they are still impermissible because they deceptively imply that consumers must only use Harley-Davidson parts to keep their warranties valid. We can assume, without deciding, that § 2302(c) or § 2310(c)(1) prohibit implied tying and that Heymer could bring a claim against that practice under § 2310(d)(1), but that is far from clear.

To support an implied tying theory of liability, Heymer points again to the FTC's interpretive guidance for § 2302(c), which says:

> In addition, warranty language that implies to a consumer acting reasonably in the circumstances that warranty coverage requires the consumer's purchase of an article or service identified by brand … name is similarly deceptive. For example, a provision in the warranty such as, "use only an authorized 'ABC' dealer" or "use only 'ABC' replacement parts," is prohibited where the service or parts are not provided free of charge pursuant to the warranty. This does not preclude a warrantor from expressly excluding liability for defects or damage caused by "unauthorized" articles or service; nor does it preclude the warrantor from denying liability where the warrantor can demonstrate that the defect or damage was so caused.

16 C.F.R. § 700.10.

We agree with Heymer that the statements in the owner's manual that he complains of are best understood as implied ties. In fact, "Use only Harley-Davidson approved parts and accessories" and "Insist that your authorized Harley-Davidson dealer uses only genuine Harley-Davidson replacement parts and accessories to keep your Harley-Davidson motorcycle and its limited warranty intact" both closely mirror the FTC's example of an implied tie in § 700.10.

As was the case with Heymer's express tying theory, however, a claim for implied tying fails when we consider the relevant portions of the owner's manual and limited warranty together. Express warranties are a part of contracts, present the same interpretive problems, see *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 732 F.3d 755, 762 (7th Cir. 2013), and must be read as a whole, not by assessing each individual provision independently, *Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 823 (7th Cir. 2010).

The limited warranty clearly disclaimed any ties (express or implied) because it spelled out exactly how non-Harley-Davidson parts could affect warranty coverage. The warranty said that Harley-Davison would not cover defects or damage caused by parts or accessories that weren't approved, or damage caused by non-Harley-Davison components. That's the kind of disclaimer that § 700.10 authorizes. The warnings in the owner's manual put consumers on notice of potential consequences with the use of non-Harley-Davidson components. But the details were in the limited warranty itself, and those details are fully compliant with any prohibition on implied ties. We don't rule out the possibility that some future case might involve a warranty combining an express disclaimer

with a wealth of implied ties, such that the warranty would deceive a reasonable consumer. But the warranty before us—with a clear, acceptable exclusion provision combined with more general warnings in a separate document—does not cross that threshold. See *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 477 (7th Cir. 2020).

Heymer is entitled to all reasonable inferences. But the interpretation of an unambiguous contract is a question of law, suitable for decision on the pleadings. See *First Ins. Funding Corp. v. Fed. Ins. Co.*, 284 F.3d 799, 804 (7th Cir. 2002). Considering this contract as a whole, it's not reasonable to infer that Harley-Davidson's limited warranty implied that consumers had to use the company's products to maintain the validity of the warranty.

B

Heymer's next claim arises under § 2302(a). This provision requires warrantors to "fully and conspicuously disclose in simple and readily understood language the terms and conditions of such warranty" as required by the FTC. 15 U.S.C. § 2302(a); see also 16 C.F.R. § 701.3(a)(2)–(3) (adopting this language). Heymer says Harley-Davidson's limited warranty does not fully explain the conditions on coverage and instead requires customers to see an authorized Harley-Davidson dealer for details.

However, Heymer never articulates what warranty terms Harley-Davidson purportedly applies that are not fully and conspicuously disclosed by the limited warranty. Advising customers to speak with a dealer for details does not suggest there are additional, undisclosed conditions on warranty coverage or that the disclosed conditions are unclear. A

warrantor can always provide customers with more detail. But detail comes at a cost. So long as the warranty clearly describes the scope of warranty coverage, a warrantor does not need to exhaustively delineate every particular situation that falls outside the scope of the warranty. See *Bailey v. Monaco Coach Corp.*, 350 F. Supp. 2d 1036, 1041–42 (N.D. Ga. 2004), aff'd, 168 F. App'x 893 (11th Cir. 2006) ("Requiring a warrantor to set forth an exhaustive list, from bumper to bumper, of every included and excluded item would prove unduly burdensome and unnecessary for a clear description of the scope of warranty coverage."). Absent specific allegations about what warranty terms are unclear or undisclosed, Heymer cannot state a claim merely by alleging that Harley-Davidson directs customers to speak with a dealer if they have questions about their warranty.

Heymer only points to two other statements he says are unclear: "The use of parts and service procedures other than Harley-Davidson approved parts and service procedures may void the limited warranty." And: "Some countries, states or other locations may require all regular maintenance and service work to be done by an authorized Harley-Davidson dealer for your warranty to remain in effect. Check with your local Harley-Davidson dealer for local requirements." But, as we explained above, these are cautionary statements that are neither in the limited warranty nor purport to modify or supplement its terms. Moreover, the Warranty Act does not task warrantors with keeping their customers abreast of local requirements that may affect the scope of warranty coverage. The FTC's own regulations instruct warrantors to provide customers with similarly broad warnings concerning variations in state law. See 16 C.F.R. § 701.3(a)(7) ("Some States do not allow limitations on how long an implied warranty lasts,

so the above limitation may not apply to you."); *id.*
§ 701.3(a)(8) ("Some States do not allow the exclusion or limi-
tation of incidental or consequential damages, so the above
limitation or exclusion may not apply to you."); *id.*
§ 701.3(a)(9) ("This warranty gives you specific legal rights,
and you may also have other rights which vary from State to
State.").

C

Heymer's final Warranty Act claim is brought under
§ 2302(b). That provision, and its accompanying regulation,
requires that the terms of a warranty be made available to con-
sumers prior to the sale of the product. 15 U.S.C. § 2302(b); 16
C.F.R. § 702.3(b). There are multiple ways to satisfy this pre-
sale availability rule. A warrantor can, for example, make the
terms of the warranty available on its website, include a copy
of the written warranty with every warranted product, or pro-
vide a sign, notice, or other attachment that discloses the text
of the warranty. *Id.*

In his complaint, Heymer alleges that Harley-Davidson
does not provide signs to its authorized dealers. But he
doesn't allege that the limited warranty is unavailable on
Harley-Davidson's website or that the company fails to
include a copy of the limited warranty with every warranted
product. Because there are several ways to comply with the
pre-sale availability rule, Heymer cannot state a claim simply
by alleging that Harley-Davidson has failed to pursue one of
them. And while Heymer says we must accept as true his
allegation that the terms of the warranty were not provided
in accordance with § 702.3(b), that is precisely the kind of
legal conclusion we disregard at the motion to dismiss stage.

*Cielak v. Nicolet Union High Sch. Dist.*, 112 F.4th 472, 475 (7th Cir. 2024).

For the foregoing reasons, we affirm the dismissal of Heymer's Warranty Act claims.

IV

Next, we turn to Heymer's state law antitrust claims. He raises three types of claims: a tying claim, an attempted monopolization claim, and a *Kodak*-style lock-in claim. Although these claims are not brought under the Sherman Antitrust Act, 15 U.S.C. § 1 et seq., the parties agree that the relevant state antitrust laws are generally interchangeable with federal law and have relied principally on federal case law in their briefs. Accordingly, we assume without deciding that the federal standard applies.

A

Heymer first claims that the statements in the owner's manual create an anticompetitive tie by conditioning warranty coverage on the exclusive use of Harley-Davidson parts. A tie is anticompetitive when the seller exploits "its control over the tying product to force the buyer into the purchase of a tied product that the buyer … might have preferred to purchase elsewhere on different terms." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984). To state a claim, a plaintiff must establish that (1) a tying arrangement exists between two separate products or services; (2) "the defendant has sufficient economic power in the tying product market to restrain free competition in the tied product market"; (3) "the tie affects a not-insubstantial amount of interstate commerce in the tied product"; and (4) "the defendant has some economic

interest in the sales of the tied product." *Siva v. Am. Bd. of Radiology*, 38 F.4th 569, 574 (7th Cir. 2022) (quotations omitted).

Here, we do not need to determine whether a tying arrangement exists because Heymer has not adequately pleaded the second element of a tying claim. According to the complaint, Harley-Davidson captures one-fifth of the market for large, roadgoing motorcycles sold in the United States. That is not a sufficient market share to plausibly infer economic power in the tying market. *Will v. Comprehensive Acct. Corp.*, 776 F.2d 665, 672 (7th Cir. 1985) (citing *Jefferson Par.*, 466 U.S. at 26–31 & n.43). Heymer does not argue otherwise. Instead, he alleges that the relevant tying product market is limited to motorcycles manufactured by American brands. Harley-Davidson would have a significantly larger market share—at least 80 percent—under Heymer's proposed market definition. But such a narrowly defined market is implausible.

A product market is generally "composed of products that have reasonable interchangeability for the purposes for which they are produced." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956). "However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Therefore, courts must consider several other factors when determining how to properly define the relevant product market, including "such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.*

These practical indicia are largely absent from the complaint. Heymer does not allege American-made motorcycles have peculiar characteristics and uses, unique production facilities, or specialized vendors. And the mere existence of American Iron Magazine, a publication that covered American-made motorcycles for 30 years, provides scant support for industry or public recognition that American-made motorcycles are effectively a separate economic entity. While Heymer alleges that Harley-Davidson motorcycles are generally more expensive than other motorcycles, higher prices do not, by themselves, indicate a cognizable submarket. *Id.* at 326; *duPont*, 351 U.S. at 400–02. Instead, Heymer's position hinges on distinct customers. According to the complaint, some consumers will only purchase American-made motorcycles because, for them, motorcycles serve as a means to celebrate their national heritage and express their patriotism. But without more, these allegations do not warrant limiting the relevant market to American-made motorcycles.

To start with, the allegations in the complaint are more consistent with a single-brand submarket than an American-made submarket. For example, Heymer only alleges that Harley-Davidson motorcycles are more expensive than other brands, not that American-made motorcycles as a whole are more expensive. Although he acknowledges that there are other American-made motorcycles on the market, Heymer says there are no close substitutes to Harley-Davidson for many riders. The consumer studies cited in the complaint similarly focus on the distinctive subgroup of motorcycle enthusiasts that are bound by a shared commitment to Harley-Davidson. And to the extent riders use their motorcycles to celebrate their American heritage, Heymer

says it is through Harley-Davidson-affiliated groups specifically. These allegations are all indicative of customer loyalty to the Harley-Davidson brand, not American-made motorcycles more generally.

Consumer preference for a particular brand is not sufficient to plausibly allege a single-brand market absent significant differences in product design or quality. 2B Philip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 563d (5th ed. 2025) (explaining the presumption against single-brand markets); *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) (dismissal on the pleadings appropriate to resolve "failed attempts to limit a product market to a single brand"). In product-differentiated markets, customers will often have idiosyncratic preferences that align them more closely with a particular brand. "[T]his kind of preference does not translate into the kind of economic power that antitrust law aims to mitigate." *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 23 (1st Cir. 1999); see also *duPont*, 351 U.S. at 392–93; *Elliott v. United Ctr.*, 126 F.3d 1003, 1005 (7th Cir. 1997); *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 723–24 (3d Cir. 1991) (collecting cases). Absent something more concrete than mere brand preference, Heymer cannot plausibly allege a single-brand product market.

Even setting aside the brand-specific allegations in the complaint, Heymer has not plausibly alleged the existence of an American-made submarket. Support for this submarket largely stems from Harley-Davidson's own marketing efforts to associate its brand with American identity and iconography. As Heymer acknowledges, the company began this all-American branding effort in the 1980s to distinguish

itself from Japanese brands that were becoming increasingly popular in the United States. The complaint even refers to these Japanese brands as Harley-Davidson's "nearest competitors" in terms of market share. Rather than supporting an American-made submarket, we view Harley-Davidson's vigorous marketing efforts as indicative of interbrand competition.

We are aware of only one precedential decision squarely holding that the relevant market was limited by a product's place of manufacture. In *McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015), the Eleventh Circuit found sufficient evidence that domestically manufactured pipe fittings comprised the relevant market even though they were functionally identical to imported pipe fittings. *Id.* at 828–30. But there, the submarket for domestically manufactured pipe fittings was limited to an identifiable, discrete segment of the market: customers with "domestic-only" project specifications. *Id.* at 829. Various laws and end-user preferences precluded the use of imported pipe fittings in these projects. *Id.* As a result, McWane was able to charge significantly more to these customers than it could to customers with "open" project specifications. *Id.*

Although Heymer also claims that some riders will only purchase American-made motorcycles, nothing in the complaint suggests they comprise an identifiable, discrete subset of consumers that can be similarly exploited via price discrimination. See Areeda & Hovenkamp, supra, ¶ 563d ("A single brand or differentiated product within a product class is presumptively not a separate market … unless a substantial group of customers can be significantly exploited via price discrimination."). Unless Heymer is suggesting that *every* Harley-Davidson customer would only purchase American-

made motorcycles, the fact that Harley-Davidson motorcycles are generally more expensive than other brands is not enough on its own to show price discrimination. That is particularly true where, like here, there is no allegation that other American-made motorcycles are also more expensive than foreign-made motorcycles.

B

Next, Heymer claims that Harley-Davidson impermissibly used its alleged monopoly power in the tying market to attempt to monopolize the aftermarket in parts compatible with Harley-Davidson motorcycles. To make out an attempted monopolization claim, a plaintiff must show "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

As we discussed in Part IV.A, Harley-Davidson does not have market power in the tying market, so Heymer cannot plausibly allege that the company engaged in anticompetitive conduct. See *Jefferson Par.*, 466 U.S. at 11–14 (explaining that tying is not anticompetitive conduct absent market power in the tying market); see also *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023) ("Where, like here, the plaintiff challenges the same conduct pursuant to Sections 1 and 2, we can review claims under each section simultaneously.") (quotation omitted).

Further, Heymer has not shown a dangerous probability of achieving monopoly power. According to the complaint, there is a "vast" and "robust" aftermarket for compatible parts that offers consumers a wide variety of options, even

excluding the parts manufactured by Harley-Davidson. For example, the complaint identifies nearly a dozen brands the company competes with and suggests there are many more. The aftermarket is as large as it is, Heymer says, because riders are willing to keep older Harley-Davidson motorcycles on the road for generations. Compared to the longevity of Harley-Davidson motorcycles, the limited warranty lasts no longer than the first two years of a motorcycle's useful life. And even then, it only forecloses competition for parts that would not be covered by the limited warranty and for riders that seek to keep their warranty intact. Heymer fails to explain how such a short-lived restraint on trade creates a dangerous probability of achieving monopoly power in an aftermarket he concedes is vast, robust, and offers consumers a wide variety of options.

## C

Finally, Heymer raises a *Kodak*-style lock-in claim. He says he was unaware of the alleged warranty tie when he purchased his motorcycle, at which point he had no choice but to purchase higher-priced Harley-Davidson parts if he wanted to keep his warranty intact. But Heymer cannot plausibly allege a lock-in claim when the limited warranty was available to him at the time he purchased his motorcycle.

The Supreme Court addressed the issue of aftermarket lock ins in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992). Kodak sold copiers that could be serviced either by the company or by one of several independent service organizations. *Id.* at 456–58. But after Kodak had sold a substantial number of copiers, it began limiting the availability of parts to independent service organizations. *Id.* at 458. This change in policy pushed many of them out of business

and forced customers to switch to Kodak for servicing. *Id.* Despite its success in restraining competition, Kodak argued that it could not exercise market power in the aftermarket for parts or services because any increase in prices would lead to a corresponding loss in profits from lower copier sales. *Id.* at 465–66. The Court rejected Kodak's argument, reasoning that the company was still able to take advantage of its existing customers' sunk costs. *Id.* at 476–77. These customers had purchased their copiers before they knew they would be locked into Kodak service, and the copiers were too expensive to easily replace in response to higher-than-expected prices in the aftermarket. *Id.*

Here, Heymer does not allege that Harley-Davidson changed its warranty practices after he purchased his motorcycle. Rather, Heymer says he was told he would lose coverage if he used non-Harley-Davidson parts by the limited warranty documents themselves, which he received when he purchased his motorcycle. As discussed in Part III.C, Heymer does not plausibly allege that he couldn't access the terms of the limited warranty before he purchased his motorcycle. In fact, he appears to acknowledge—both in the complaint and in his briefs on appeal—that the terms of the limited warranty are available on Harley-Davidson's website. Like we explained in *Digital Equipment Corp. v. Uniq Digital Technologies, Inc.*, 73 F.3d 756 (7th Cir. 1996):

> The Court did not doubt in *Kodak* that if spare parts had been bundled with Kodak's copiers from the outset, or Kodak had informed customers about its policies before they bought its machines, purchasers could have shopped around for competitive life-cycle prices. The

> material dispute that called for a trial was
> whether the change in policy enabled Kodak to
> extract supra-competitive prices from custom-
> ers who had already purchased its machines.

*Id.* at 763. Unlike the customers in *Kodak*, then, Heymer could have factored the costs of any alleged tie into his purchasing decision. See *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 440 (3d Cir. 1997); *Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 745 (5th Cir. 2010); *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1048 (9th Cir. 2008).

Before concluding, we also note that the switching costs here are much less substantial than they were in *Kodak*. Kodak customers would have had to purchase an entirely new copier if they wanted to avoid using Kodak parts and servicing. If Heymer wants to avoid using Harley-Davidson parts, the only cost to him would be forgoing the remainder of his warranty coverage, which lasts no longer than two years anyway. We do not think these are the kind of switching costs the Court was referring to in *Kodak*.

For the foregoing reasons, Heymer has failed to plausibly state an antitrust claim.

## V

Heymer raises several other state law claims involving fraud and unjust enrichment. These claims are based on the same anticompetitive conduct as his antitrust claims, and Heymer makes no argument on appeal that they should

survive independently of those claims.[2] Because the district court did not err in dismissing the antitrust claims, it did not err in dismissing these claims either.

AFFIRMED

---

[2] In a different section of his brief, Heymer does suggest that one of his state law claims may be independently viable. But because Heymer failed to adequately develop this argument both on appeal and in the district court, it is waived. *Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016).

LEE, *Circuit Judge*, dissenting in part and concurring in part. I join much of the majority's opinion. First, I agree with my colleagues that the district court's dismissal of Plaintiffs' claim under the Magnuson-Moss Warranty Act's disclosure requirement, 15 U.S.C. § 2302(a), should be affirmed. The claim should be dismissed to the extent that it is is based on the need to contact Harley-Davidson authorized dealers to flesh out how the warranty restrictions described in the warranty might impact their individual situations. As the majority points out, because Plaintiffs do not identify what information was not disclosed, we cannot determine whether Plaintiffs plausibly alleged that the nondisclosures affected the warranty (if at all).

Second, I agree that the district court's dismissal of Plaintiffs' claim under the Warranty Act's pre-sale availability requirement, 15 U.S.C. § 2302(b), should be affirmed for the reasons the majority opinion explains.

Third, I agree that Plaintiffs have failed to state a claim that Harley-Davidson violated state antitrust laws by attempting to monopolize the market for Harley-Davidson aftermarket parts. I do so, however, solely on the grounds that Plaintiffs have failed to allege a dangerous probability of achieving monopoly power. (In my view, Plaintiffs have plausibly alleged that Harley-Davidson has sufficient market power in the tying market for the reasons I discuss below.)

Lastly, I agree that Plaintiffs cannot make out a "*Kodak*-style lock-in claim" (although I believe this claim is merely a variation of a Sherman Act § 1 tying claim and not an independent antitrust claim as Plaintiffs suggest).

I part with the majority opinion, however, in two significant ways. First, I believe Plaintiffs have adequately alleged that Harley-Davidson violated § 2302(c) of the Act, 15 U.S.C. § 2302(c), by conditioning (either expressly or impliedly) warranty coverage for its motorcycles on a customer's use of only Harley-Davidson aftermarket parts (for simplicity's sake, I will refer to these as "HD parts"). Taking Plaintiffs' well-pleaded allegations as true—as we must at the pleading stage—they plausibly assert that (1) Harley-Davidson expressly conditioned its warranty on the use of HD parts, as evidenced by statements in the Owner's Manual, and (2) alternatively, to the extent this condition was not expressly stated in the Owner's Manual, the company imposed an implied tie when the manual is considered in conjunction with the real-world experience of Harley-Davidson customers.

Second, I believe that the complaint plausibly alleges an antitrust product market comprising American-made, large roadgoing motorcycles and that Harley-Davidson exercised its market power in this market to tie warranty coverage to the use of HD parts in violation of state antitrust statutes that mirror § 1 of the Sherman Act, 15 U.S.C. § 1.

In rejecting these claims, the majority inverts the long-established standard under Federal Rule of Civil Procedure 12(b)(6) and grants Harley-Davidson, rather than Plaintiffs, the benefit of all reasonable factual inferences. For example, it discounts express statements of condition in the Harley-Davidson Owner's Manual in favor of more ambiguous ones. And it chooses to reject Plaintiffs' plausible definition of the applicable product market by recasting it as a "single-brand market" (even though Plaintiffs do not allege such a market)

without the benefit of fact or expert discovery. For these reasons as explained below, I respectfully dissent.

I

First, Plaintiffs have plausibly alleged a claim that Harley-Davidson violated the Warranty Act's anti-tying prohibition in violation of § 2302(c). The Act prohibits a warrantor from conditioning a warranty for a consumer product on the consumer's use of an article or a service which is identified by brand, trade, or corporate name (unless provided without charge). 15 U.S.C. § 2302(c).

Here, Plaintiffs allege that Harley-Davidson's 2021 Owner's Manual, which the complaint incorporates by reference, contains a limited two-year warranty. That warranty guarantees "for any new 2021 Harley-Davidson motorcycle that an authorized HD dealer will repair or replace without charge any parts found under normal use to be defective in factory materials or workmanship."

As a condition of coverage, however, the warranty requires the customer to follow the instructions in the Owner's Manual. For example, in the very beginning, the warranty states: "As *a condition* of this warranty, you are responsible for properly using, maintaining, and caring for your motorcycle *as outlined in your Owner Manual*." Likewise, the section of the warranty entitled "Exclusions" provides: "This limited warranty will not apply to any motorcycle … [w]hich has not been operated or maintained *as specified in the owner's manual*."

This then leads us to the Owner's Manual, which includes a section entitled, "Warranties and Responsibilities." This section, in turn, has two subsections entitled "Warranty and Maintenance" and "Keeping It All Harley-Davidson." The

first lays out the following mandate: "Use *only* Harley-Davidson approved parts and accessories that have been designed, tested and approved for your model and model year motorcycle." The second subsection contains a similar instruction to customers and expressly links the condition to the warranty: "Insist that your authorized Harley-Davidson dealer uses only genuine Harley-Davidson replacement parts and accessories *to keep your Harley-Davidson motorcycle and its limited warranty intact*." Thus, read together, the warranty and the Owner's Manual passages it references expressly inform consumers that Harley-Davidson will not honor the warranty if the customer does not use HD parts.

What is more, according to Plaintiffs, this is what happened in the real world. Harley-Davidson dealers were denying warranty coverage, claiming that customers were using unauthorized parts. Indeed, Plaintiffs allege, dealers were economically incentivized to do so because non-warranty repairs get reimbursed immediately, whereas dealers had to "wait up to ninety days to be compensated" for warranty repairs.

Rather than assuming the truth of these allegations and drawing all reasonable inferences in Plaintiffs' favor, the majority focuses on the portion of the Owner's Manual that contains softer, more ambiguous language: "The use of parts and service procedures other than Harley-Davidson approved parts and service procedures may void the limited warranty." Slip Op. at 10. Emphasizing the word "may," the majority casts these statements as "simply offer[ing] a general warning to consumers that using unauthorized parts in their motorcycles *may* void the warranty." *Id.* at 11.

But this language cannot support the weight the majority places on it. In fact, this sentence does not suggest in any way that Harley-Davison did not condition its warranty on the use of HD parts. Rather, its permissive language merely states that Harley-Davidson *could* do this, and the previously discussed statements in the warranty and Owner's Manual, as well as additional allegations in the complaint, indicate that Harley-Davidson *did* do this. These statements are not mutually exclusive. And, certainly, at the pleading stage, Plaintiffs are entitled to the benefit of that inference. Thus, I believe that Plaintiffs have sufficiently alleged an express tie to satisfy their obligations under Rule 8 and Rule 12(b)(6).

In addition, Plaintiffs have adequately alleged, in the alternative, that Harley-Davidson imposed an implied tie by including language in the warranty and Owner's Manual that would lead a reasonable consumer to believe that he had to use HD parts to maintain the warranty. On this, the majority appears to agree, explaining that "the statements [Plaintiffs] complain[] of are best understood as implied ties." Slip Op. at 13. But, then, it pronounces that "the limited warranty clearly disclaimed any ties (express or implied)." *Id.* I respectfully disagree.

True, the warranty states that it does not cover "[d]efects or damage to the motorcycle caused by alterations out of Harley-Davidson's factory specifications or caused by alterations or use of parts or accessories not approved for the make and model year of your motorcycle." But, in my view, this phrase does not do the work the majority would have it do.

First, note that this statement excludes from warranty coverage "[d]efects or damage … *caused by*" unapproved

alterations. I agree with the majority that such a condition does not violate § 2302(c). But this is not what Plaintiffs allege. Instead, their theory is that, under the limited warranty, *any* use of non-HD parts—even those that are unrelated to the damage the owners seek to remedy—precludes warranty coverage.

Second, as noted previously, the warranty states from the beginning that proper use and maintenance as outlined in the Owner's Manual is "a condition of this warranty." And it does so again in the exclusions section of the warranty. When read alongside the language in the Owner's Manual requiring use of HD parts, "such warranty language … implies to a consumer acting reasonably in the circumstances that warranty coverage" is tied to HD parts. 16 C.F.R. § 700.10(c). *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 167 (2012) ("Context is a primary determinant of meaning.").

Finally, the majority is correct to say that "the interpretation of an unambiguous contract is a question of law." Slip Op. at 14. But, when we consider all of the relevant statements in the warranty and Owner's Manual, they at a minimum create significant ambiguity as to what exactly the warranty requires. And, when contract terms are ambiguous, we consider extrinsic facts to determine the parties' intent, including subsequent performance. *See* 11 Williston on Contracts § 30:7 (4th ed. 1990) ("When a written contract is ambiguous, its meaning is a question of fact, requiring a determination of the intent of parties in entering the contract.") (footnote omitted); *id.* § 32:14 ("[T]he parties' own practical interpretation of the contract—how they actually acted, thereby giving meaning to their contract during the course of performing it—can be an

important aid to the court.") (footnote omitted). Such an inquiry is fact-intensive, typically requiring discovery. *See, e.g., Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 1000 (7th Cir. 2018) (denying motion to dismiss on contract claim and allowing parties on remand to "introduce extrinsic evidence to substantiate their reading of the contract").

After the facts come out, it is quite possible that Plaintiffs may not be able to prove this claim. But, at the motion-to-dismiss stage, we have to assume the facts as Plaintiffs have alleged them. Viewed through this lens, Plaintiffs' implied tying claim falls neatly under § 2302(c).

In sum, taking Plaintiffs' allegations to be true and giving them the benefit of all reasonable inferences, the Owner's Manual declares (or, alternatively, implies) that Harley-Davidson conditioned its warranty on its customers' use of HD parts in violation of § 2302(c).

II

In my view, Plaintiffs also have plausibly alleged a tying arrangement that illegally restrains trade in violation of state antitrust laws that mirror § 1 of the Sherman Act. To make out a § 1 tying claim, a plaintiff must establish: (1) the tying arrangement is between "two separate products"; (2) "the defendant has sufficient economic power in the tying market to restrain free competition in the tied product market"; (3) "a not-insubstantial amount of interstate commerce in the tied product" is affected; and (4) "the defendant has an economic interest in the sales of the tied product." *See Siva v. Am. Bd. of Radiology*, 38 F.4th 569, 573 (7th Cir. 2022). The majority opinion rests on the second element, stating that Plaintiffs have

failed to plausibly allege a relevant tying market. But this is incorrect for the reasons I will explain.

First off, it is worth reiterating that this case is at the pleading stage, and thus we must accept as true the complaint's well-pleaded factual allegations and draw all reasonable inferences in Plaintiffs' favor. Moreover, we must exercise particular caution when dismissing an antitrust claim for failing to allege a relevant market at the pleading stage. As the Supreme Court has recognized, this is because identifying the scope of a relevant market requires resolving empirical questions that "can be determined only after a factual inquiry into the commercial realities faced by consumers." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992) (internal quotation marks omitted). Similarly, we too have recognized that "market definition is a deeply fact-intensive inquiry," and that courts therefore "hesitate to grant motions to dismiss for failure to plead a relevant … market." *Fourqurean v. Nat'l Coll. Athletic Ass'n*, 143 F.4th 859, 870 (7th Cir. 2025) (citing *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001)); *see MCM Partners Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 972, 977 (7th Cir. 1995) (reversing dismissal of claim under § 1 of Sherman Act for failure to plead facts supporting market definition).

Here, Plaintiffs allege that Harley-Davidson enjoys 80% of the national market in "American-made, new, large, roadgoing motorcycles."[1] The majority proclaims that "such

---

[1] One might question whether the tying product is the warranty or the motorcycle itself. But neither party has argued that this distinction matters, and counsel acknowledged at oral argument that no market exists for new-motorcycle warranties. Thus, for present purposes, I will adopt

a narrowly defined market is implausible," Slip Op. at 18, but it does not explain why this is so. Instead, the majority advances a different product market from the one Plaintiffs assert and faults Plaintiffs for failing to include specific allegations to support it.

A "relevant market" under the Sherman Act is comprised of the "commodities reasonably interchangeable by consumers for the same purposes." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). The two components of the relevant market are the product market and the geographic market. *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 917 (7th Cir. 2020). The parties do not dispute that Plaintiffs have properly alleged the United States as the relevant geographic market.

As for the product market, "[t]he Supreme Court has held that the concept of economic substitution is the primary means by which to define a product market." *Kaiser Aluminum & Chem. Corp. v. FTC,* 652 F.2d 1324, 1330 (7th Cir. 1981). And "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Id.* (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).

Here, Plaintiffs allege that American-made motorcycles do not experience cross-elasticity of demand with foreign-made motorcycles. That consumers would not substitute products made domestically or in certain countries for products manufactured elsewhere is certainly plausible.

the parties' treatment of a new Harley-Davidson motorcycle and its accompanying warranty as a bundled product.

*See, e.g., McWane, Inc. v. FTC*, 783 F.3d 814, 830 (11th Cir. 2015) (defining product market as domestically manufactured pipe fittings); *Transource Intern. Inc. v. Trinity Indus., Inc.*, 725 F.2d 274, 283 (5th Cir. 1984) (determining the relevant market to be "all gondolas and railcars manufactured in this country"); *In re Ductile Iron Pipe Fittings (DIPF) Direct Purchaser Antitrust Litig.*, No. 12-cv-711, 2013 WL 812143, at *16 (D.N.J. Mar. 5, 2013) (concluding that plaintiffs "have adequately pled that the relevant market is the domestic DIPF market"); *Union Cosmetic Castle, Inc. v. Amorepacific Cosmetic USA, Inc.*, 454 F. Supp. 2d 62, 65 n.1 (E.D.N.Y. 2006) (accepting "at this stage of the proceedings … the plaintiffs' representations that the market for Korean-manufactured cosmetic products … constitutes a discrete relevant market").[2]

Furthermore, to the extent that the market for American-made, large roadgoing motorcycles can be considered a sub-market of large, roadgoing motorcycles generally (as the majority appears to do), the allegations in the complaint plausibly allege the existence of such a submarket under the factors the Supreme Court elucidated in *Brown Shoe*, 370 U.S. at 325 (recognizing that "within a broad market, well-defined sub-markets may exist which, in themselves, constitute product markets for antitrust purposes"). There, the Supreme Court

---

[2] The majority's attempts to distinguish *McWane* are unpersuasive. First, the majority points out that the consumers in that case had "domestic-only" project specification. Slip Op. at 21. But, as the *McWane* court recognized, a pipefitter with "domestic-only" product specifications are, for purposes of market definition, simply "end users with domestic only preferences." *McWane*, 783 F.3d at 829. In that way, they are exactly like the consumers here who, Plaintiffs allege, prefer American-made motorcycles.

observed, "[t]he boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.*

Although the majority protests that these practical indicia are "largely absent" from the Plaintiffs' allegations, Slip Op. at 19, this is too crabbed a reading of the complaint. Admittedly, the complaint does not refer to *Brown Shoe* by name, but the fact that a motorcycle is "American-made" speaks to both "unique production facilities" and "particular characteristics and uses" that distinguish it from a foreign-made motorcycle. The complaint also points to a long-running publication solely dedicated to American-made motorcycles as well as the behavior of consumers of American-made motorcycles who see their bikes as expressions of patriotism, which leads to a reasonable inference of "industry or public recognition." Moreover, as the majority acknowledges, the complaint describes "a distinct ridership and following for American-made motorcycles."

When these allegations are taken to be true, "it is not inconceivable to us that [Plaintiffs] could prove a set of facts supporting the relevant market definition alleged in its complaint." *MCM Partners*, 62 F.3d at 977. This is the test for plausibly alleging a product market to survive Rule 12(b)(6), and I believe that Plaintiffs have met it. *See also Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001) (noting that "[m]arket definition

is a highly fact-based analysis that generally requires discovery") (citations omitted).[3]

The majority's recasting of the relevant market as a "single-brand submarket" is particularly puzzling, given that Plaintiffs plainly do not assert such a market. For its part, the majority opinion points to Plaintiffs' allegations that Harley-Davidson motorcycles are more expensive than others and that the company possesses a dominant market share as compared to other American motorcycle manufacturers. But these allegations illustrate Harley-Davidson's market power in the American-made, large roadgoing motorcycle market (another element of a § 1 tying claim), not the existence of a single-brand market.

Accordingly, I would conclude that Plaintiffs' proposed market is plausible and that they have sufficiently alleged the second element of a restraint-of-trade tying claim, given Harley-Davidson's undisputed dominance in that market. Moreover, for the reasons noted above, I believe that the complaint sufficiently alleges a tying arrangement between Harley-Davidson motorcycles, which are bundled with the limited warranty, and Harley-Davidson parts. And, according to Plaintiffs, Harley-Davidson generates approximately $482.2 million from Harley-Davidson parts,

---

[3] By contrast, the majority opinion gives no credit to the allegations describing Harley-Davidson's efforts to appeal to consumers looking for American-made motorcycles, finding instead that these efforts are "all indicative of customer loyalty to the Harley-Davidson brand." Slip Op. at 20. But, in doing so, it again gives Harley-Davidson the benefit of all factual inferences rather than Plaintiffs.

plausibly alleging that a not-insubstantial amount of interstate commerce in the tied product is affected and that Harley-Davidson has an economic interest in the sales of the tied product. In sum, the complaint sufficiently alleges that Harley-Davidson imposed a tying arrangement which illegally restrained trade in violation of the state law analogues to § 1 of the Sherman Act.

\* \* \*

For these reasons, I would reverse and remand the judgment of the district court as to Plaintiffs' claims under § 2302(c) of the Warranty Act, the state law analogues to § 1 of the Sherman Act, and the state unjust enrichment claims to the extent that they can be based on the foregoing conduct. I join the majority opinion in affirming the dismissal of the remaining claims.