In the

# United States Court of Appeals
## For the Seventh Circuit

No. 21-2334

SADHISH K. SIVA,

*Plaintiff-Appellant,*

*v.*

AMERICAN BOARD OF RADIOLOGY,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:19-cv-01407 — **Jorge L. Alonso**, *Judge.*

ARGUED FEBRUARY 16, 2022 — DECIDED JUNE 28, 2022

Before RIPPLE, SCUDDER, and KIRSCH, *Circuit Judges.*

SCUDDER, *Circuit Judge.* In antitrust law, "easy labels do not always supply ready answers." *Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 8 (1979). This appeal is a prime example of the need to look through labels to substance. Doing so reveals a pleading failure. At the outset of litigation, the burden falls to the plaintiff to articulate—in a short and plain statement—a plausible theory of his case. On this score Sadhish Siva has fallen short, so we affirm the district court's

dismissal of his antitrust complaint challenging an alleged ty-
ing arrangement by the American Board of Radiology.

## I

### A

The Board is a private, nonprofit provider of medical cer-
tifications to radiologists—one of 24 such entities nationwide,
each dedicated to a different medical specialty. Upon com-
pleting medical school and a residency program, newly
minted radiologists can seek certification through the Board.
Radiologists who pass the Board's exam and pay the required
fee become "Board certified." The Board is the dominant firm
in the market for radiology certifications.

Strictly speaking, Board certification is optional. As we re-
cently explained, "all states permit physicians who choose not
to become (or remain) Board certified to practice medicine,"
provided they possess a valid state medical license. *Assoc. of
Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 15
F.4th 831, 832 (7th Cir. 2021). In medicine as in law, state li-
censing boards typically require doctors to complete a certain
number of continuing medical education (or CME) credits
each year to remain licensed to practice. But none require
physicians to obtain Board certification.

Even so, plaintiff Sadhish Siva, a Board-certified radiolo-
gist, says certification is "an economic necessity without
which a successful medical career is impossible." Most insur-
ers will not grant in-network status to physicians who are not
Board certified. And, partially as a result, uncertified physi-
cians are often shut out from meaningful employment oppor-
tunities at hospitals, health systems, practice groups, and
other medical employers. Accordingly, Siva alleges, "almost

all [practicing] radiologists today have found it necessary to purchase [Board] certifications."

When the Board began selling certifications in 1934, radiologists who passed the Board examination would remain certified for life. But in the early 2000s the Board shifted away from lifelong certifications to a model with two components: "initial certification" and "maintenance of certification" or MOC. Passing the Board exam now confers only initial certification. Radiologists who wish to remain Board certified must now participate in and pay for the MOC program each year. Those who do not will lose their certifications and suffer any attending professional consequences. What that means, Siva asserts, is that just as initial certification is voluntary in name only, radiologists have no choice but to participate in the MOC program.

The MOC program has three main components. *First*, the program requires radiologists to obtain a certain number of CME credits each year from third-party CME providers. The complaint indicates that this requirement is largely "redundant of other CME obligations radiologists already have for State medical licensure and other professional purposes." *Second*, the MOC program requires radiologists to complete certain "practice improvement" activities designed to teach new skills and practice techniques, though the complaint tells us little about what these activities are or how often they must be completed. *Third*, radiologists must pass certain Board-administered examinations or tests.

MOC has taken various forms over the years, with most changes involving its testing component. In 2002 the Board began selling only 10-year certifications that could be renewed by passing "onerous, full-day, high stakes, closed

book [recertification] examinations every ten years." Starting in 2006, the Board charged radiologists an annual MOC participation fee in addition to fees associated with the 10-year exams. Then, in 2013, the Board unveiled "MOC 2.0," which added annual evaluations on top of the 10-year recertification exams. Finally, 2019 saw the introduction of "MOC 3.0," the program's current iteration, which dropped the 10-year exam altogether in favor of what the Board calls an Online Longitudinal Assessment program or OLA. OLA tests consist of two multiple choice questions emailed to radiologists each week, or 104 per year, of which a radiologist must answer 52 correctly to pass. According to the complaint, OLA questions are very easy, so few radiologists are likely to fail.

When the Board adopted the MOC program in the early 2000s, it imposed the requirement only prospectively. Radiologists who became Board certified prior to MOC's arrival, therefore, are "grandfathered" into lifetime certifications regardless of whether they participate in (or pass) the MOC program. The Board nevertheless offers these radiologists the opportunity to partake in the MOC program voluntarily. According to one study cited in the complaint, however, only 14% do so.

B

The Board says this is all legitimate and lawful. It is in the certifications business, after all, and a certifying entity gets to decide what applicants must do to earn its stamp of approval. On this view, the Board believes it was well within its rights to redesign its certification process to require participation in its MOC program—to move from a model of one-time, life-long certification to a new design it says ensures radiologists

remain well-qualified to practice radiology throughout their careers.

But Siva sees things differently. He contends that MOC should be thought of not as part of the Board's certification product but as a unique product in its own right. And so, Siva claims, the Board's decision to revoke the certification of radiologists who refuse to participate in the MOC program reflects not a benign product redesign but rather an illegal tying arrangement that violates § 1 of the Sherman Act, 15 U.S.C. § 1.

A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *N. Pac. R. Co. v. United States*, 356 U.S. 1, 5 (1958). Not all ties are prohibited, though. Indeed, many "are fully consistent with a free, competitive market." *Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 45 (2006).

A tie is illegal only when the seller "exploit[s] … its control over the tying product to force the buyer into the purchase of a tied product" and in so doing "coerces the abdication of buyers' independent judgment as to the 'tied' product's merits and insulates it from the competitive stresses of the open market." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12–13 (1984) (quoting *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 605 (1953)); see also *Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 592 (7th Cir. 2008) (explaining that the "traditional antitrust concern" with ties "is that if the seller of the tying product is a monopolist, the tie-in will force anyone who wants the monopolized product to buy the tied product from him as well, and the result will be a second monopoly"). "When such 'forcing' is present," the Supreme

Court has underscored, "competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Jefferson Parish*, 466 U.S. at 12.

Courts applying *Jefferson Parish* have found such anticompetitive forcing when four elements are present. As a threshold matter, the challenged tying arrangement must involve two separate products or services. See *Reifert v. S. Cent. Wisconsin MLS Corp.*, 450 F.3d 312, 317 (7th Cir. 2006). From there the plaintiff must allege that the defendant has "sufficient economic power in the tying product market to restrain free competition in the tied product market," that "the tie affects a not-insubstantial amount of interstate commerce in the tied product," and that the defendant "has some economic interest in the sales of the tied product." *Id.*

Siva asserts that the Board's conduct checks each box. His chain of reasoning entails a few links. Prior to introducing the MOC program, the Board sold only lifetime certifications to radiologists who had recently completed a residency program. In Siva's view, then, certification represents a one-time, "knowledge-based assessment of postgraduate medical education and training." But the MOC program, as the Board's own bylaws acknowledge, serves a different purpose: "[t]o promote lifelong and continuous learning, professional growth, quality, and competence."

That latter purpose, Siva alleges, has long been served by a separate category of products—what Siva calls continuing professional development or CPD products. The term CPD encompasses a variety of "educational and developmental activities"—seminars, conferences, videos, and the like—aimed at "promot[ing] the development of both medical and non-medical competencies, including professionalism, and

interpersonal, managerial and communication skills." According to Siva's complaint, a robust market for CPD products (populated by medical schools, hospitals, professional societies, and other organizations) has existed for decades separate from and alongside the market for certifications.

Siva's basic contention is that the Board's MOC program—requiring, as it does, radiologists to complete a variety of continuing education activities to retain their certifications—is nothing but a cleverly named CPD product, just like any other available in that separate market. By Siva's account, then, the Board has used its monopoly in certification—a one-time, early-career assessment of competency—to force radiologists to purchase a lifetime subscription to its CPD offering, a product some radiologists would like to buy from other providers in the CPD market. And that scheme, Siva says, has all the makings of an illegal tying arrangement under § 1 of the Sherman Act.

C

The district court dismissed Siva's complaint, concluding that it had not plausibly alleged the first element of a tying claim—that certification and MOC are two separate products. The district court did not quibble with Siva's assertions that "MOC is a kind of CPD product" and that CPD products have long been sold separately from certifications, a factor the Supreme Court has indicated points toward a finding of separate products. Instead, the district court reasoned that even if MOC was a CPD product by another name, that fact "d[id] not separate it from [the Board's] core certification product because it does not account for the fact that MOC has been essentially integrated into the certification product in a way that no other CPD product has." And so, because "radiologists

buy [MOC] to maintain [Board] certification," the court concluded that MOC "is not 'fungible' with CPD products that do not serve that purpose," and thus could not be thought of as a separate product from certification.

Siva declined the district court's invitation to amend his complaint and instead appealed, asserting that the court's analysis reflected legal error.

## II

At the pleading stage, Siva bears the burden of alleging facts giving rise to a plausible inference that, after discovery, he will be able to prove each element of his tying claim. See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (explaining that a plaintiff must allege "enough facts to state a claim for relief that is plausible on its face"). Ensuring compliance with this standard is particularly important in the antitrust context so as to avoid "the potentially enormous expense of [antitrust] discovery in cases with no reasonably founded hope" of success. *Id.* at 559 (cleaned up); see also *Assoc. of Am. Physicians & Surgeons*, 15 F.4th at 835 (recognizing that "*Twombly* bars [a] discover-first, plead-later approach" in part because "modern antitrust litigation is expensive").

We agree with the district court that Siva failed to carry his pleading burden, though we reach that conclusion for different reasons.

## A

The separate-products question in tying law is notoriously murky. A savvy lawyer can describe any product as a tie of its components, and any tie as a single product. To cut through the metaphysics, the Supreme Court has set out a separate-products test rooted in the purpose of the rule against tying—

to prevent monopolists from leveraging power in one market to restrict competition in a second. See Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1700d1 (4th ed. 2015) (Areeda & Hovenkamp). That forbidden result can occur, the Court has explained, only where "there is a sufficient demand for the purchase of [the tied product] separate from [the tying product] to identify a distinct product market in which it is efficient to offer [the tied product] separately from [the tying product]." *Jefferson Parish*, 466 U.S. at 21–22. The question "whether one or two products are involved" thus turns on "the character of the demand for the two items." *Id.* at 19.

Courts performing this inquiry must assess market demand "at the pre-contract rather than post-contract stage"— before the alleged tying arrangement went into effect. *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 469 (7th Cir. 2020) (citing Areeda & Hovenkamp ¶ 1802d6). Doing otherwise by looking at market demand in the post-tie world runs the risk of "immuniz[ing] the worst-case scenario of a successful tie by which a monopolist successfully leverages a monopoly in the tying product into a monopoly in the tied product." Areeda & Hovenkamp ¶ 1745d1.

From this pre-contract vantage point, a number of objective indicators of market demand help answer the separate-products question. Some useful considerations are "how the market participants have sold and purchased the [items]," *Viamedia*, 951 F.3d at 469, whether the two items are "separately priced and purchased," *Jefferson Parish*, 466 U.S. at 20, and whether they are "distinguishable in the eyes of buyers." *Id.* at 19. But one factor courts may *not* consider, the Supreme Court has made clear, is "the functional relation between" the

two items. *Id.* And so, "the mere fact that two items are complements, [or] that 'one … is useless without the other,' … does not make them a single 'product' for purposes of tying law." *United States v. Microsoft Corp.*, 253 F.3d 34, 86 (D.C. Cir. 2001) (quoting *Jefferson Parish*, 466 U.S. at 19). The focus is not on how the products function together, but on how consumer demand for them interacts.

Assessing consumer demand may be especially difficult when a defendant creates a product bundle that has not been marketed in the past. See *id.* at 89 (explaining that "[t]he per se rule's direct consumer demand and indirect industry custom inquiries are, as a general matter, backward-looking and therefore systemically poor proxies for overall efficiency in the presence of new and innovative integration"). In such cases, a finding of separate products may, by deeming beneficial innovation illegal, undermine antitrust's goal of promoting consumer welfare. It is therefore essential to distinguish between those cases in which a defendant has "discovered a desirable new way of combining inputs into a better product," and those that represent only "an anticompetitive tie that no one has tried before." Areeda & Hovenkamp ¶ 1746. To do so, it is helpful to ask whether, in the past, "buyers were putting the items together to operate in the same manner as the defendant's bundle." *Id.* ¶ 1746a. If they were, the new bundle is more likely to be a tie than a truly innovative new product. See *id.*

B

Siva sees a straightforward tying arrangement here: the Board, to his eye, has leveraged its monopoly in the certification market to force radiologists to purchase MOC, a

CPD product some radiologists would prefer to purchase elsewhere.

If we start with "how the market participants have sold and purchased the [items]," it is easy to see that CPD products and certifications are separate products. *Viamedia*, 951 F.3d at 469. Prior to the creation of the MOC program, Board certifications were valid for life, and radiologists separately purchased CPD products from third-party vendors, both to comply with state licensing requirements and, one imagines, for their own betterment as medical professionals. Siva's complaint identifies various institutions—medical schools, professional societies, clinics, and the like—that have sold CPD products to radiologists "for decades" without selling accompanying certification products. All told, "the character of the demand" for CPD products is distinct from that for certifications, so they are separate products under *Jefferson Parish*, 466 U.S. at 19.

On that much everyone seems to agree. And Siva says that is the end of the matter: if CPD products and certifications are separate products, and (as he alleges) MOC is a CPD product, then MOC and certifications must also be separate products. Likewise, Siva adds, because radiologists for decades "were putting [CPD products and certifications] together to operate in the same manner as the [Board's] bundle," there is no risk that tying liability here would stifle beneficial innovation. Areeda & Hovenkamp ¶ 1746a.

The Board, appealing to the nature of certifications, resists this conclusion. Because a certifying entity "has the right to set its own certification standards," the Board says, its decision to exercise that right to modify its certification product to contain a CPD-style component is not subject to antitrust

scrutiny. After all, only the Board can offer "a program to maintain its own certification."

The district court saw things much like the Board. In its view, the long history of separate demand for CPD products and certifications did not indicate separate products here, because "MOC has been essentially integrated into the certification product in a way that no other CPD product has." As the district court put it, "a maintenance-of-certification program that lacks the imprimatur of the certifying entity has no value to any physician seeking to demonstrate that he has obtained and maintained certification."

Recall, though, that we must assess market demand from a pre-tie rather than a post-tie perspective. See *Viamedia*, 951 F.3d at 469. In the pre-tie world, Board certification was not something that needed to be "maintained" through completion of any CPD program; it was valid for life. So the district court was right to observe that "CPD products serve a different purpose from certification and had nothing to do with it" prior to the introduction of the MOC program. But the district court never went the next step to see that, in Siva's view, this is precisely the problem: CPD products, he alleges, *still* have nothing to do with certification—in other words, consumer demand for the two products remains distinct. As such, Siva says, the Board's decision to name its CPD product "maintenance of certification" is nothing but a clever means of disguising a tying arrangement. Siva therefore urges that we see through that strategic naming decision—that marketing ploy—in conducting the separate-products analysis.

A fanciful example shows that Siva must be right. Suppose that, instead of the MOC program as it currently stands, the Board decided it would revoke the certifications of any

radiologist who did not purchase a monthly subscription of Board-branded office supplies. Further suppose that the Board calls its office-supplies subscription program "maintenance of certification." It is easy to see that, despite the name, the arrangement concerns separate products. Consumer demand for office supplies has nothing to do with consumer demand for radiology certifications. The Board's decision to call its office supplies "maintenance of certification" does not make the two distinct products (radiology certifications and office supplies) one. See William Shakespeare, *Romeo and Juliet*, act II, sc. ii ("What's in a name? That which we call a rose by any other name would smell as sweet."). The Board sells medical certifications. As to office supplies, its "imprimatur" is irrelevant: radiologists do not demand the Board's stamp of approval as to their taste in pens and staplers.

Just so here, on Siva's account. In reaching the conclusion that certification and MOC were a single product in part because of the degree of "integrat[ion]" between the two, the district court improperly approached the analysis from a post-tie perspective. See *Viamedia*, 951 F.3d at 469. And in crediting the Board's characterization of its product over the well-pleaded and contrary allegations in Siva's complaint, the district court also "may have drifted beyond reviewing the legal sufficiency of [Siva's] allegations into a fact-finding role." *Zimmerman v. Bornick*, 25 F.4th 491, 493 (7th Cir. 2022). The mere fact that, as the district court found, "radiologists buy [MOC] to maintain [Board] certification," does not mean that MOC "is not 'fungible' with CPD products that do not serve that purpose"—it may just mean that alleged the tying arrangement has worked as planned.

As the Supreme Court has explained, while firms are entitled to "substantial latitude" to design and redesign products in the pursuit of "legitimate business interests, … none of that means a party can relabel a restraint as a product feature and declare it immune from § 1 scrutiny." *Nat'l Collegiate Athletic Ass'n*, 141 S. Ct. 2141, 2163 (2021) (cleaned up). We are therefore not required to accept the label the Board has given its product. We must instead determine what its product *is*—or, more precisely, what Siva's complaint alleges it to be—guided by the Supreme Court's precedents. We know that CPD products and certification products exist in separate markets. And so we must decide whether Siva has alleged sufficient facts to make it plausible that MOC is in fact a CPD product that competes on the merits in that separate CPD market.

## C

Siva has fallen short. He alleges that the Board has leveraged its monopoly in radiology certifications to restrain trade in the market for continuing education CPD products. But just as the Board cannot escape tying liability by naming a CPD product "maintenance of certification," Siva cannot survive dismissal by asserting in conclusory fashion that MOC *is* a CPD product. See *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) (explaining that conclusory allegations are "not entitled to be assumed true" at the pleading stage). Saying so is not enough: he must instead plead facts making it plausible that MOC is a substitute for other CPD products. See *Reifert*, 450 F.3d at 318 ("Products and services are in the same market when they are good substitutes for one another.").

To do so, the well-pleaded facts in Siva's complaint must permit an inference of what economists call "cross-price elasticity" between MOC and other CPD offerings, such that—in

a world without the tying arrangement—an increase in the price of other CPD products relative to MOC would shift sales to MOC. *Id.* at 319. Put in plainer English, the two products must be "reasonabl[y] interchangeab[le]" in the minds of relevant consumers, *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962), meaning that a radiologist shopping for CPD products might see the Board's MOC program as a viable option for filling that need.

To know whether the required cross-price elasticity could plausibly exist, it is essential to define not only what a CPD product is, but also what consumer demand in the CPD market looks like. Paragraph 99 of Siva's complaint reveals that the CPD market is, at bottom, a market for educational content across a broad range of topics, including:

> value-based delivery and cost reduction, clinical knowledge and skills, patient experience, practice improvement, diversity and inclusion, interprofessional practice, doctor wellness and burnout, patient safety, working in teams, health care disparities, and population health.

Paragraph 100, meanwhile, describes the variety of educational "[m]ethods and tools" employed by CPD vendors:

> [L]ectures, clinical case conferences, morbidity and mortality conferences, panel discussions, audience response systems, team-based learning, video or digital presentations, small group or paired interactions, online learning, coaching and mentoring, self-reflection and self-assessment, peer observation and feedback, patient-led activities, debate formats, and simulations.

> … Performance (*i.e.*, the outcome or effective-
> ness of the CPD product) is usually measured
> by examinations and simulations.

Crucially, Siva's complaint indicates that demand for this content seems to be driven largely by state licensing require-ments. As the complaint explains, the first CPD products ap-peared in the 1940s and 1950s, and they "proliferated in the ensuing years, especially as they became required for State medical licensure, which typically requires 40–50 hours of CME credit every two years." The complaint goes on to ex-plain that, as a result, "[t]he terms CME and CPD are some-times used interchangeably or in tandem, for example as 'CPD/CME.'" The "CPD market" described in Siva's com-plaint thus seems primarily to be one for educational content accredited to satisfy state CME requirements. To the extent there exists a standalone market for non-accredited CPD products, Siva's complaint tells us next to nothing about it.

With that market structure in mind, we turn to the dispos-itive question: whether the complaint's well-pleaded allega-tions permit an inference that radiologists would see the Board's MOC product as a true competitor in the CPD market as Siva describes it. He says the answer is yes. His complaint asserts that the MOC program "encompasse[s]" all of the same educational topics using "[a]ll or many" of the same ed-ucational formats, making it just like any other CPD product available on the market. But a closer look at the complaint's description of MOC undermines that assertion.

Recall that the MOC program has three main components: (1) a requirement that radiologists obtain a certain number of CME credits each year "from third party CME providers"; (2) an examination component currently consisting of the

weekly OLA tests; and (3) a series of so-called "practice im-provement projects."

Siva's theory of the case starts to come undone at the first requirement. By his own characterization, demand for CPD products is really just demand for educational content that satisfies state CME requirements. But there is no indication in the complaint that the Board itself actually produces, offers, or otherwise has a financial stake in any accredited CME products. Instead, MOC's primary feature is a requirement that radiologists purchase CME (or CPD) products from *other* providers—the same medical schools, hospitals, professional societies, and other organizations that have long offered CPD/CME products. Indeed, it seems radiologists could not purchase these products from the Board even if they wanted to—the Board does not offer them.

Two conclusions flow from that observation. The first is that MOC is an "unlikely substitute[ ]" for a run-of-the-mill CPD/CME offering. *Reifert*, 450 F.3d at 319. No radiologist looking to fulfill his state CME obligations, in other words, would do so by purchasing MOC, because MOC simply im-poses a redundant obligation that he purchase those credits elsewhere. The CPD/CME market is a market for educational content, Siva's complaint tells us, but the MOC program con-tains no such content. MOC thus does not plausibly compete in the market for CPD/CME products. Our second point is that, for this reason, the alleged MOC tie poses no risk of fore-closing competition in the market for CPD/CME products— the hallmark of an illegal tying arrangement and the lynchpin of Siva's theory of the case. See *id.* at 320.

Do not let the acronyms distract. What all of this means in concrete terms is that Siva has failed to allege that the Board's

challenged conduct could plausibly give rise to the result for-
bidden by the rule against tying—the use of monopoly power
in one market (radiology certifications) to restrict competition
in a second market (continuing education products). Put an-
other way, despite Siva's conclusory assertions that the
Board's maintenance of certification program *is* a continuing
education product, the well-pleaded facts point in the oppo-
site direction—that the Board does not offer any product that
could plausibly compete in the continuing education market.

Our conclusion holds even when we consider the MOC
program's remaining two components—the Board-adminis-
tered OLA tests and practice improvement projects. To be
sure, unlike the CME-credit requirement, these features of the
MOC program actually involve Board-created educational
content. But Siva's complaint gives us no reason to think ra-
diologists would view these tests and activities as viable CPD
products in their own right. Radiologists cannot earn CME
credits by completing the weekly OLA tests or the practice-
improvement projects. Nor does it seem radiologists would
buy them for any other reason.

Indeed, to hear Siva tell it, these aspects of the program are
good for nothing at all: the exams are "onerous and ineffec-
tive" and "wholly superfluous," he says, and the practice im-
provement activities are "burdensome and meritless" "make-
work with no value." All told, Siva says radiologists "receive
nothing of benefit in return" for the MOC fees they are forced
to pay. The program, he concludes, is "worthless"—a money-
making scheme that provides no independent professional
value to radiologists.

We do not doubt the sincerity of Siva's frustrations with
the MOC program, but these allegations do not help him

plead an unlawful tying arrangement. To the contrary, they confirm our earlier conclusion that no radiologist shopping for CPD products would voluntarily purchase MOC if given the option. The products are not substitutes. As the Supreme Court in *Jefferson Parish* explained, "when a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller in the tied product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed." 466 U.S. at 16. If MOC is truly useless as a CPD product, in other words, then forcing radiologists to buy it poses no threat to competition in the CPD market. The arrangement is therefore innocuous from an antitrust perspective—at least on the allegations in Siva's present complaint.

That result makes sound sense. Siva alleges that the Board is a monopolist in radiology certifications, but he does not assert that it obtained that monopoly unlawfully. See 15 U.S.C. § 2 (prohibiting only "monopoliz[ing]" and "attempt[ing] to monopolize"). If that is true, then the Board is well within its rights to charge a monopoly price for its certifications. See *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (explaining that "[t]he mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system"). What is more, it may choose whether to collect that monopoly price all at once or over time. It would seem perfectly lawful, therefore, for the Board to charge radiologists an annual fee to maintain their certifications in good standing. And there is no reason for the result to change if, in addition to the annual fee, the Board makes them jump through some hoops as well. As long as those

hoops do not harm competition in a second market, the Sherman Act is not violated.

The only factual allegation in the complaint that might indicate that MOC is *not* worthless is Siva's claim that some radiologists who are grandfathered into lifetime certifications nevertheless purchase MOC unbundled from certification. For these radiologists, participating in the MOC program has no bearing one way or the other on their continued certification. And so they must have decided to pay for access to the MOC program for some other reason. But what is missing from this portion of the complaint is some factual allegation that these radiologists have purchased MOC *instead of* some other CPD offering available on the market—that they are buying MOC as their CPD product of choice.

Without such an allegation, we are left to conclude that Siva has failed to plead a plausible claim for tying. He has not plausibly alleged that MOC is a viable competitor in the market for CPD products. He therefore cannot identify a "distinct product market in which it is efficient to offer [MOC] separately from [certification]." *Jefferson Parish*, 466 U.S. at 21–22. And more fundamentally, there is no chance that, as currently pled, the Board's decision to force radiologists to purchase MOC could possibly restrain "competition on the merits in the [CPD] market." *Id.* at 12.

*          *          *

Much of Siva's pleading deficit here stems from not attending to the commands of Federal Rule of Civil Procedure 8. To survive dismissal, a complaint must articulate "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). But Siva's

complaint is neither short nor plain—its 379 paragraphs span nearly 80 pages. We understand, of course, that complex antitrust claims may lend themselves to lengthier complaints. But in Siva's case, that added length clouded rather than clarified his theory of the case. Having undertaken our own fresh, thorough review of Siva's complaint, "accepting all well-pleaded factual allegations as true and drawing permissible inferences in [Siva's] favor," *Aluminum Trailer Co. v. Westchester Fire Ins. Co.*, 24 F.4th 1134, 1136 (7th Cir. 2022), we conclude that the district court was right to dismiss it for failure to state a tying claim under § 1 of the Sherman Act.

The district court's judgment is AFFIRMED.