In the

# United States Court of Appeals
## For the Seventh Circuit

No. 24-1994

EMILY ELIZABETH LAZAROU, *et al.*,

*Plaintiffs-Appellants*,

*v.*

AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:19-cv-01614 — **Jeremy C. Daniel**, *Judge*.

ARGUED JANUARY 8, 2025 — DECIDED OCTOBER 29, 2025

Before SCUDDER, JACKSON-AKIWUMI, and MALDONADO,
*Circuit Judges*.

JACKSON-AKIWUMI, *Circuit Judge*. This antitrust appeal
asks us to decide whether the American Board of Psychiatry
and Neurology ("ABPN") is causing unfair competition in the
continuing medical education market. The psychiatrists who
brought this suit allege that ABPN uses its monopoly over
specialty certifications to force them to purchase ABPN's
"maintenance of certification" product. But their theory that

this arrangement violates antitrust law can only succeed if psychiatrists and neurologists view ABPN's product as a viable alternative to fulfilling their continuing medical education requirements. We addressed a similar question in *Siva v. American Board of Radiology*, 38 F.4th 569 (7th Cir. 2022), and found that a different medical specialty board's product was not a viable alternative for doctors seeking continuing medical education credit. Although the allegations against ABPN differ from those in *Siva*, they still do not allow us to find an illegal tying of ABPN's products—a prerequisite for stating this type of antitrust claim. We therefore affirm the district court's dismissal of the case and its dismissal with prejudice.

**I**

We review de novo a district court's Rule 12(b)(6) dismissal. *Right Field Rooftops, LLC v. Chi. Cubs Baseball Club*, LLC, 870 F.3d 682, 688 (7th Cir. 2017). In doing so, we take all well-pleaded facts in a complaint as true and draw all reasonable inferences in favor of the plaintiff. *Id.*; *Stanley v. City of Sanford*, 606 U.S. – (slip op. at 1) (2025). Given this standard, we recite the following factual allegations as they appear in the amended complaint (hereinafter complaint).

By law, doctors must obtain a license from state medical boards to practice medicine in a particular state. To remain licensed, most states require doctors to complete a certain number of continuing medical education ("CME") hours. As described in the complaint, CME consists of educational activities to "maintain, develop, or increase the knowledge, skills, and professional performance" of doctors. The complaint focuses on two categories of CME products: Category 1 and Category 2. Doctors earn Category 1 credits

by either purchasing products from any accredited vendor or completing educational activities and applying to the American Medical Association ("AMA") for "direct credit." One of the ways doctors can earn Category 2 credits (and the only way discussed in the complaint) is by purchasing CME self-assessment products. In many states, doctors can also apply Category 2 credits towards Category 1 requirements.

Licensed doctors may also purchase certifications from medical specialty boards in specialties such as, as relevant here, psychiatry or neurology, or in subspecialties like forensic psychiatry. While board certification is not legally required, almost all medical organizations, according to the complaint, require board certification for employment, hospital privileges, and even coverage by health insurance plans.

ABPN is one such medical specialty board. Psychiatrists and neurologists may apply for a certification from ABPN after completing medical school and residency training. Doctors' one-time purchase of a certification does not guarantee them a lifelong certification. To maintain their specialty certification, they must purchase ABPN's maintenance of certification ("MOC") product annually for a $175 fee. Otherwise, ABPN revokes the certifications of doctors who do not purchase its MOC product. ABPN is the only vendor from which doctors with its certification can secure MOC, and ABPN sells MOC only to doctors with its certification.

ABPN's MOC has two main components: Activity Requirements and an Assessment Requirement. As part of the Activity Requirements, every three years doctors must obtain 90 CME credits and complete one Improvement in Medical Practice (referred to as "PIP") activity. Of the 90 CME credits, 66 must be CME Category 1 and 24 must be CME Category 2

self-assessment credits (not to be confused with the MOC As-
sessment Requirement).

For the MOC Assessment Requirement, doctors can either
complete an Article-Based Pathway every three years or pass
a Recertification Exam every ten years. The Recertification
Exam involves a day-long, proctored, and closed book exam
that ABPN develops and administers. The Article-Based Path-
way entails passing 30 short exams associated with a medical
journal or article of ABPN's choosing. For this pathway, doc-
tors can take a maximum of 40 short exams and must success-
fully complete 30 of them. If unable to complete 30 out of 40
exams, doctors must take the ten-year Recertification Exami-
nation.

Completing either Assessment Requirement allows
doctors to waive some of their Activity Requirements credits.
When a doctor successfully completes an Article-Based
Pathway, ABPN waives 16 out of the 24 CME Category 2 self-
assessment credits. ABPN similarly waives 8 out of the 24
CME Category 2 self-assessment credits for doctors who take
the Recertification Examination. These requirements are
diagrammed below.

**ABPN's MOC Requirements**

| Activity Requirements |
|---|
| 90 CME Credits every 3 years:<br>    • 66 CME Category 1<br>      * Purchase from CME vendor; or<br>      * Complete educational activities for direct credit from AMA<br>    • 24 CME Category 2 self-assessment<br>      * 16 waived with successful Article-Based Pathway<br>      * 8 waived with successful Recertification Exam<br><br>**and**<br><br>PIP activity every 3 years |
| *Assessment Requirement* |
| Article-Based Pathway every 3 years<br><br>**or**<br><br>Recertification Exam every 10 years |

The plaintiffs in this case are two licensed psychiatrists: Dr. Emily Elizabeth Lazarou and Dr. Aafaque Akhter. Dr. Lazarou is a practicing psychiatrist whose certification lapsed when she did not receive an accommodation as a nursing mother and was thus unable to complete her Recertification Exam. Without a certification, she can no longer practice telepsychiatry in Florida, Texas, Mississippi, or Illinois, where she is licensed.

Dr. Akhter is currently an ABPN-certified psychiatrist but complains about the time, money, and effort it takes to complete MOC requirements to maintain his certification. Dr. Akhter passed ABPN's ten-year Recertification Examination and applied to the AMA to receive direct credit for CME Category 1 credits. The AMA granted him 60 Category 1 credits separate from CME credits he had already purchased to fulfill his MOC Activity Requirements. Dr. Akhter then used the 60 credits to meet state licensure requirements, instead of purchasing CME from CME-accredited vendors. He is licensed to practice medicine in Connecticut, Florida, Hawaii, Massachusetts, and New York.

Dr. Lazarou and Dr. Akhter brought claims on behalf of themselves and a proposed class action alleging that ABPN's tying of its certifications and MOC violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and results in unjust enrichment under state law. After Plaintiffs filed a second amended complaint, ABPN moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). The district court dismissed the complaint, finding several flaws in Plaintiffs' tying theory. It also concluded dismissal with prejudice was justified because Plaintiffs had multiple opportunities to amend their complaint.

## II

### A

The Sherman Act prohibits "certain agreements or practices ... because of their pernicious effect on competition and lack of any redeeming virtue." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958). One such prohibited practice is a tying arrangement. *Id.* A tying arrangement is "an agreement by a

party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *Id.* "Not all ties are prohibited, though. Indeed, many 'are fully consistent with a free, competitive market.'" *Siva*, 38 F.4th at 573 (quoting *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 45 (2006)).

"A tie is illegal only when the seller exploits its control over the tying product to force the buyer into the purchase of a tied product." *Id.* (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12–13 (1984)) (citation modified). This coerces the buyer to abdicate "independent judgment as to the 'tied' product's merits and insulates it from the competitive stresses of the open market." *Id.* at 573–74 (quoting *Jefferson Parish*, 466 U.S. 2, 12–13). This anticompetitive forcing is a violation of the Sherman Act. *Id.* at 574.

Anticompetitive forcing exists where four elements are present: (1) the tying arrangement involves two separate products or services; (2) the seller has "sufficient economic power in the tying product market to restrain free competition in the tied product market"; (3) "the tie affects a not-insubstantial amount of interstate commerce in the tied product"; and (4) the seller "has some economic interest in the sales of the tied product." *Id.* (quoting *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 317 (7th Cir. 2006)).

The first element, otherwise known as the separate-products question, is rooted in "prevent[ing] monopolists from leveraging power in one market to restrict competition in a second [market]." *Id.* at 575 (citing Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1700d1 (4th ed. 2015)). This can result "only where there is a sufficient demand for the

purchase of the tied product separate from the tying product to identify a distinct product market in which it is efficient to offer the tied product separately from the tying product." *Id.* (quoting *Jefferson Parish*, 466 U.S. at 21–22) (citation modified). Thus, the separate-products question "turns on 'the character of the demand for the two items' .... before the alleged tying arrangement went into effect." *Id.* (quoting *Jefferson Parish*, 466 U.S. at 19). Courts look to several "objective indicators of market demand" to answer this question: "how the market participants have sold and purchased the [items];" "whether the two items are 'separately priced and purchased;'" and "whether they are 'distinguishable in the eyes of buyers.'" *Id.* at 576 (first quoting *Viamedia*, 951 F.3d at 469; and then quoting *Jefferson Parish*, 466 U.S. at 20). However, we cannot consider "the functional relation between the two items." *Id.* (citation modified). Rather, we focus "on how consumer demand for [the products] interacts," not on "how the products function together." *Id.*

**B**

ABPN argues that Plaintiffs must establish a reasonable comparison between MOC and doctors' state licensure. This is wrong. As in *Siva*, Plaintiffs here must only "plead facts making it plausible that MOC is a substitute for other [CME] products." 38 F.4th at 578.

But to survive dismissal, it is not enough for Plaintiffs to assert "in conclusory fashion that MOC *is* a [CME] product." *Id*. at 579. Instead, the allegations must allow an inference of "cross-price elasticity" between MOC and other CME offerings. *Id.* This means that "in a world without the tying arrangement—an increase in the price of other [CME] products relative to MOC would shift sales to MOC." *Id.* (citing *Reifert*,

450 F.3d at 319). The question, in effect, is whether the relevant consumers see the two products as "reasonably interchangeable." *Id.* (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)) (citation modified).

For example, in *Siva*, our court found that, as alleged, a radiology board's MOC was not a substitute for the rest of the market's CME and thus, no illegal tie existed. *Id.* at 580–81. The MOC product in that case involved slightly different components from ABPN's MOC. To maintain their radiology certifications, doctors had to: (1) obtain certain CME credits from a third-party vendor every year; (2) complete an examination component consisting of weekly tests; and (3) fulfill a series of practice improvement projects. *Id.* at 579. We held that the first requirement was not a likely substitute for CME because it would be redundant to purchase MOC to then be told to buy CME elsewhere. *Id.* Moreover, CME provided educational content, but MOC's first requirement did not. *Id.* As to the second and third requirements, these did involve educational content. *Id.* at 580. However, we found there was "no reason to think radiologists would view these tests and activities as viable [CME] products" since they could not "earn CME credits by completing [them]." *Id.* Even the *Siva* plaintiff had described the tests and activities as "onerous" and "superfluous." *Id.* Although the radiology board indeed had a monopoly, we concluded, it was not an antitrust violation because there was no impact to competition and no market foreclosed. *Id.*

## C

As in *Siva*, the market at issue is an educational content market for doctors' continuing education obligations. We conclude that Plaintiffs do not plausibly allege that ABPN's

monopoly over specialty certifications is causing unfair competition in that market. The complaint does not "permit an inference that [psychiatrists and neurologists] would see [ABPN's] MOC product as a true competitor" in the CME market. *Siva*, 38 F.4th at 579.

Plaintiffs resist this conclusion. According to them, their complaint addresses *Siva*'s shortcomings by alleging that (1) ABPN's MOC contains educational content and (2) doctors use ABPN's MOC to meet state CME licensure requirements partially or in full.

On the first point, we see a split picture. Plaintiffs do plausibly allege that ABPN's Assessment Requirement provides educational content, like CME does, in the form of article-based or recertification examinations. However, in their reply brief, Plaintiffs explain that *only* the Assessment Requirements can lead to direct CME credit and are therefore equivalent to other CME products. ABPN's *Activity* Requirements are different and, Plaintiffs concede, not CME-equivalent. Presumably, Plaintiffs make this concession because the Activity Requirements, for the most part, simply redirect doctors to purchase CME credits from accredited vendors. And, as the district court noted, Plaintiffs do not allege that ABPN is accredited to provide CME products that satisfy its own Activity Requirements. As such, ABPN's Activity Requirements continue to "impose[] a redundant obligation that [doctors] purchase those credits elsewhere." *Siva*, 38 F.4th at 579 (referring to the radiology board's first requirement that doctors obtain a certain number of CME credits from third-party vendors).

On the second point—that doctors use MOC to meet their state licensure CME requirements—Plaintiffs present two

theories (which will be the subject of our next subsections). First, Plaintiffs allege that many states accept MOC participation as full satisfaction of CME requirements, without the need to obtain any additional Category 1 credits. We refer to this as the "full satisfaction theory." Second, Plaintiffs allege that doctors who complete the Recertification Examination may apply to the AMA for direct CME credit and use those credits towards state licensing requirements. We refer to this as the "direct credit theory."

Both theories fail. Even if MOC fully or partially satisfies doctors' state licensure CME requirements, we cannot reasonably infer that doctors view MOC as reasonably interchangeable with CME, thereby causing unfair competition in the CME market. This is because, setting aside any benefit MOC has as state licensure CME requirements are concerned, MOC forces doctors to spend, as Plaintiffs allege, a "substantial cost in money, time, and effort." We address both theories in more detail below.

### 1. The Full Satisfaction Theory

Plaintiffs offer New Hampshire and Washington as examples of states that accept MOC participation to fully satisfy state licensing CME requirements. Generally, for doctors to maintain their state license in New Hampshire or Washington, they would need to purchase 100 Category 1 CME credits every two years (or 50 credits per year) from an accredited vendor. Alternatively, doctors could participate in MOC, which only requires 90 CME credits every three years (or 30 credits per year) as part of its Activity Requirements. Because MOC Activity Requirements demand fewer CME credits (30 compared to New Hampshire and Washington's requirement of 50), Plaintiffs argue that doctors prefer to purchase MOC

and, as a result, vendors accredited to sell CME lose out on the purchase of an additional 20 credits. As previewed earlier, this theory fails because it does not account for the MOC product's requirements in their entirety.

On the surface, MOC Activity Requirements would seem attractive to doctors seeking to purchase fewer CME credits. But the MOC requirement does not end there. The Activity Requirements also include a PIP activity. And then there is the Assessment Requirement. So doctors signing up to buy fewer CME to satisfy their state licensure CME obligations, would also have to spend considerable time, money, and effort completing a PIP, taking 30 article-based exams every three years or a Recertification Examination every ten years, or both if they are initially unsuccessful in passing the 30 article-based exams—all in addition to paying a $175 fee for MOC. Even in a world where CME prices increase relative to MOC, we cannot infer, from these facts, that the price increase "would shift sales to MOC." *Siva*, 38 F.4th at 578. In other words, we cannot infer that psychiatrists and neurologists shopping for CME products would see ABPN's MOC as "a viable option for filling that need." *Id.*

## 2. The Direct Credit Theory

We turn to Plaintiffs' second theory about how doctors use MOC to meet their state licensure CME requirements and therefore MOC, as Plaintiffs see it, is a substitute for other CME products. With their second theory, Plaintiffs argue that psychiatrists and neurologists can apply ABPN's Assessment products to satisfy state CME requirements. This was the case with Dr. Akhter, who took ABPN's ten-year Recertification Examination and earned 60 Category 1 "direct credits" from the AMA, which he applied toward his state licensing

requirements rather than buy CME from accredited vendors. We test this theory with an example Plaintiffs offer in their briefs.

Plaintiffs point to Hawaii and Massachusetts, where Dr. Akhter is licensed. Hawaii and Massachusetts each require 100 CME Category 1 credits every two years (or 50 credits per year). Doctors who purchase MOC would have 66 CME Category 1 credits (or 22 credits per year) secured from a vendor as part of their Activity Requirements.[1] They would then need to make up, if licensed in Hawaii and Massachusetts, about 28 credits per year. Overlooking the 8-credit gap, Plaintiffs argue that doctors take the Recertification Examination to cover the remaining 20 credits per year, instead of purchasing additional CME.[2] This equation is diagrammed below.

---

[1] In briefing, Plaintiffs repeatedly assert that doctors would gain 90 CME Category 1 credits from meeting their MOC Activity Requirements. This contradicts the complaint, which alleges that only 66 of the 90 CME requirements for MOC are Category 1, with the remaining 24 being Category 2.

[2] It is worth noting that 60 credits divided over the ten-year period before a Recertification Exam lapses results in 6, not 20, credits per year. In any event, because the theory nonetheless fails, we assume Plaintiffs' 20 credits are true for purposes of our discussion.

**Plaintiffs' Direct Credit Theory on an Annual Basis**

| State CME Category 1 Requirement | Category 1 CME Purchased for MOC's Activity Requirements | MOC's Direct Credit from AMA | Additional CME Needed |
|---|---|---|---|
| 50 — | 22 — | 20 = | 8 |

This theory fails for some of the same reasons the full satisfaction theory fails. It is implausible that a doctor would pay for the MOC product simply to avoid purchasing, for example, 20 credits per year for about three years (assuming doctors receive 60 direct credits, as Dr. Akhter did).[3] This is because this pathway forces doctors, as Dr. Akhter and Dr. Lazarou themselves allege, to invest more time, money, and effort in the long run. Recall, to participate in the MOC program Dr. Akhter would have had to: (1) pay the $175 MOC fee; (2) separately purchase up to 90 CME credits from an accredited vendor (as part of the Activity Requirements); (3) fulfill a PIP activity (again, to meet the Activity Requirements); *and* (4) complete a Recertification Exam (for the Assessment Requirement).[4] It does not follow that a doctor would opt for

---

[3] ABPN argues that states allow doctors to apply direct credit only for the same year that they complete the Recertification Exam. For support, they cite Iowa's regulations which, according to ABPN, state it "may accept certification or recertification ... [only] during the cycle in which the certification or recertification is granted." But that language is nowhere to be found in Iowa's regulations. *See* Iowa Admin. Code R. 653-11.2(2). At this stage, we draw the reasonable inference that doctors may apply direct credit over several years. *Right Field Rooftops*, 870 F.3d at 688.

[4] Plaintiffs do not allege that the Article-Based Pathway, consisting of 30 short exams, similarly yields direct credit from the AMA. Even if direct

this longer list of requirements as opposed to annually pur-chasing their state's required CME from an accredited ven-dor. As such, it is difficult to imagine that doctors would see ABPN's MOC as reasonably interchangeable with CME simply because of AMA's direct credit opportunities.

In sum, Plaintiffs have alleged a more detailed tying the-ory than the one in *Siva*. But, like the plaintiffs in *Siva*, they have failed to plausibly allege that doctors see ABPN's MOC product as reasonably interchangeable with CME. Even if the price of other CME products were to increase relative to MOC, the investment required to fulfill the MOC program makes it implausible that doctors would shift to purchase MOC. *See Siva*, 38 F.4th at 578. In so holding, we do not mean to suggest antitrust plaintiffs must present a compelling, or even probable, economic theory to survive a motion to dis-miss. But where taking an antitrust plaintiff's theory as true requires accepting a premise we find implausible, the plaintiff fails to meet the facial plausibility standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). *See also Ash-croft v. Iqbal*, 556 U.S. 662, 679 (2009) ("common sense" plays a role in the plausibility inquiry). Since Plaintiffs' allegations do not meet this standard, they fail the separate-products test, and as a result, Plaintiffs' theory of illegal tying also fails.

### III

Plaintiffs also challenge the district court's decision to dis-miss their complaint with prejudice and without leave to amend. Plaintiffs assert their second amended complaint was

---

credit was possible, doctors would nonetheless be forced to pay ABPN the $175 fee and complete the rest of the Activity Requirements outlined above as part of the MOC product.

only the first opportunity they had to address our court's holding in *Siva* given its publication date. So, they say, a third amended complaint, if permitted, would really be their second, not fourth, bite at the apple. We review the district court's decision for abuse of discretion. *Adebiyi v. S. Suburban Coll.*, 98 F.4th 886, 895 (7th Cir. 2024).

District courts "should freely give leave [to amend a complaint] when justice so requires." Fed. R. Civ. P. 15(a)(2)). "Although leave to amend is ordinarily 'freely given,' we have 'recognized, on many occasions, that a district court does not abuse its discretion by denying a motion for leave to amend when the plaintiff fails to establish that the proposed amendment would cure the deficiencies identified in the earlier complaint." *Jauquet v. Green Bay Area Cath. Educ., Inc.*, 996 F.3d 802, 812 (7th Cir. 2021) (quoting *Gonzalez-Koeneke v. West*, 791 F.3d 801, 807 (7th Cir. 2015)).

As the district court noted, Plaintiffs had several opportunities to amend their complaint. At least one of those opportunities came after our court's decision in *Siva*. On appeal, Plaintiffs do not argue why the court's dismissal was an abuse of discretion or how they could address the identified deficiencies through an amendment. On these facts, we see no abuse of discretion.

## IV

Plaintiffs' complaint reveals a monopoly for sure: ABPN controls certain specialty certifications and the MOC market. However, Plaintiffs' allegations fall short of plausibly alleging an *illegal* monopoly that ties APBN certifications and MOC to the detriment of the CME market at large. We therefore

AFFIRM the district court's decision to dismiss Plaintiffs' claims, and to do so with prejudice.

MALDONADO, *Circuit Judge*, dissenting. I am concerned with the continuous heightening of the pleading standards for antitrust claims in this circuit. This trend produces more prolix complaints filled with factual allegations that apparently still don't make the cut for suggesting liability. Here, for example, despite Plaintiffs' 51-page complaint, replete with details suggesting that CMEs and MOCs are similar in both form and function, the majority affirms dismissal of Plaintiffs' complaint because "the complaint does not permit an inference that psychiatrists and neurologists would see ABPN's MOC product as a true competitor in the CME market." Maj. Op. at 10. As the majority sees it, even if MOC, like CME, contains educational content, and even if psychiatrists and neurologists can use MOC to meet state CME licensure requirements, psychiatrists and neurologists do not "view MOC as reasonably interchangeable with CME" because MOC involves a "substantial cost in money, time, and effort." *Id.* at 11.

Because the majority sets the pleading standard too high, I respectfully dissent. Below, I briefly review the evolution of pleading standards for antitrust claims from the promulgation of Rule 8 to our opinion in *Siva v. Am. Bd. of Radiology*, 38 F.4th 569 (7th Cir. 2022). Then, I discuss why I believe that Plaintiffs here have met their pleading burden under *Siva* to survive dismissal. Lastly, I touch on what I view as the majority's speculative conclusion that MOC's diverse requirements make the program definitively less attractive to psychiatrists and neurologists such that no doctor would seek to fulfill their state licensure obligations via MOC rather than CME. Throughout, the thrust of my concern is that the majority's decision to affirm dismissal of Plaintiffs'

complaint, even in light of amendments tailored to *Siva*, amounts to changing the goal posts in the middle of the game.

## I.

In the antitrust context, pleading standards have become increasingly rigorous since the promulgation of the Federal Rules of Civil Procedure in 1938. Rule 8, by its plain text, requires only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). But construction of Rule 8 has evolved to require detailed factual allegations, making plausible an inference of liability to justify the costs of discovery. As a result, in practice, antitrust complaints have become far from "short and plain." Meanwhile, courts have essentially been invited to weigh plausible inferences, potentially denying judicial access to worthy litigants who need discovery to develop their claims. I trace below key developments in the increasing stringency of our pleading standards.

First, in *Conley v. Gibson*, the Supreme Court read Rule 8 as requiring only that a plaintiff's complaint "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." 355 U.S. 41, 47 (1957). Discovery and pretrial proceedings would flesh out the details. Defendants retained "the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues." *Id.* at 47–48, 48 n.9 (citing Rules 12(e), 12(f), 12(c), 26–37, 56, and 15).

However, some especially complex cases—in particular, sprawling antitrust conspiracies—required defendants to incur significant costs to demonstrate weaknesses in claims that could have been screened at the outset of litigation. As a result, in *Bell Atlantic Corp. v. Twombly*, where plaintiffs alleged a nationwide antitrust conspiracy among the four dominant telecommunications companies in the United States, the Supreme Court tightened Rule 8's pleading standard by requiring that a complaint contain "enough facts to state a claim to relief that is plausible on its face." 550 U.S. 544, 570 (2007); *id.* at 561, 63 (noting that the "famous observation" in *Conley*, 355 U.S. at 45–46, that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief" "has earned its retirement.").

Evincing a commitment to cost efficiency, the Supreme Court explained that "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, 'this basic deficiency should … be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Id.* at 558 (quoting 5 Wright & Miller § 1216, at 233–34). In *Twombly*, the potential time and money outlay was "obvious." *Id*. at 559. Plaintiffs sought to represent a gigantic putative class of 90 percent of all telephone or internet subscribers in the United States against the four largest telecommunications firms alleging an antitrust conspiracy spanning seven years. *Id*. As a result, discovery would have required sifting through voluminous communications among the firms to "reveal evidence of illegal agreement." *Id.* at 556.

We applied *Twombly*'s cost-conscious language in another case alleging a nationwide antitrust conspiracy: *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 15 F.4th 831, 832 (7th Cir. 2021) ("Swap major telecommunications providers for hospitals, insurers, and the American Board of Medical Specialties … and you get this case."). There, plaintiffs argued that a medical board violated § 1 of the Sherman Act where it "had conspired individually with perhaps as many as 80% of hospitals across the country" as well as "with an unspecified number of health insurers" "to force doctors" into the MOC program. *Id.* at 833. Dismissing plaintiffs' complaint for failure to state their antitrust conspiracy claim, we emphasized that "*Twombly* bars the discover-first, plead-later approach" and "[f]or good reason: modern antitrust litigation is expensive. Only by requiring plaintiffs to plead facts plausibly suggesting conspiracy can we 'avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the discovery process will reveal relevant evidence to support a § 1 claim.'" *Id.* at 835 (quoting *Twombly*, 550 U.S. at 559).

Then, in *Siva*, we expanded *Twombly*'s cost-conscious language beyond antitrust conspiracy to affirm dismissal of MOC-related tying claims under § 1 of the Sherman Act. 38 F.4th at 575. This time, the claims were rooted in contract. *Id.* at 572–73 (asserting that a medical board illegally tied certification of radiologists to the board's MOC program). We explained that to survive a motion to dismiss, plaintiffs had to plead facts "permit[ting] an inference of what economists call 'cross-price elasticity' between MOC and other [CME] offerings" in order to "mak[e] it plausible that MOC is a substitute for other [CME] products" *Id.* at 578. Specifically, a plaintiff must "define not only what a [CME] product is, but

also what consumer demand in the [CME] market looks like" to determine whether a consumer "would see the Board's MOC product as a true competitor in the [CME] market" and would "voluntarily purchase MOC if given the option." *Id.* at 579–80; *see id.* at 581 (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 22 (1984)) (alterations in original) (a plaintiff must identify a "distinct product market in which it is efficient to offer [MOC] separately from [certification]."). And a plaintiff must make these showings without appealing to the potential revocation of their certifications to bootstrap their claims. *Id.* at 577–78.

Put simply, we have come a long way from "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).

## II.

That brings us to this case, which has numerous factual parallels to *Siva*. Both allege that a medical board has a nation-wide monopoly on certifications and unlawfully ties those certifications to the board's MOCs by requiring certified specialists to purchase MOCs to maintain certification status. Both involve a violative contract (not a conspiracy) and just one participant in the antitrust violation alleged (not four as in *Twombly*, or "80% of hospitals across the country," an "unspecified number of health insurers," and a medical board, as in *Ass'n of Am. Physicians & Surgeons, Inc.*). Both cases come down to whether plaintiffs are able to "plead facts making it plausible that MOC is a substitute for other [CME] products." *Siva*, 38 F.4th at 578.

No doubt recognizing the similarities between the two cases, after *Siva* was published, Plaintiffs here amended their

complaint to address *Siva*'s specific pleading requirements. I think that they did so successfully.

Deploying various theories under which a consumer "would see the Board's MOC product as a true competitor in the [CME] market," Plaintiffs plead sufficient facts to "mak[e] it plausible that MOC is a substitute for other [CME] products." *Siva*, 38 F.4th at 578–79. First, Plaintiffs allege that psychiatrists and neurologists seeking to fulfill state CME obligations often do so by purchasing MOC because "[s]tate medical boards accept MOC in place of other CME products for licensure." Further, "AMA, the organization responsible for developing and implementing the CME credit system, gives CME Category 1 credits to doctors who purchase MOC that can be used for state licensure purposes."

And unlike the plaintiff in *Siva*, who argued that the MOC program at issue was "worthless" and worse than CMEs, *see Siva*, 38 F.4th at 580, here, Plaintiffs merely say that MOCs provide no value above and beyond CMEs. As Plaintiffs contend, MOCs and CMEs are roughly equivalent in the market for continuing education products because both "promote individual 'involvement in lifelong learning.'" These allegations are a stark departure from the complaint in *Siva*, which suggested that "[t]he [CME] market is a market for educational content … but the MOC program contains no such content," thereby defeating the plausibility of any inference that one could be a substitute for the other. 38 F.4th at 579.

Further, Plaintiffs plausibly allege that consumers would "voluntarily purchase MOC if given the option." *See Siva*, 38 F.4th at 580. Plaintiffs assert that a small portion of psychiatrists and neurologists who are "grandfathered in"

and not required to purchase MOC to maintain their certification, still buy MOC. Plaintiffs allege that these "grandfathered in" psychiatrists and neurologists "have purchased MOC *instead of* some other [CME] offering available on the market" and that "they are buying MOC as their [CME] product of choice." *See Siva*, 38 F.4th at 581. Given that in *Siva* we held that "[t]he only factual allegation in the complaint that might indicate that MOC is *not* worthless is Siva's claim that some radiologists who are grandfathered into lifetime certifications nevertheless purchase MOC unbundled from certification," *id.*, Plaintiffs' allegations of the same here would seem, by *Siva*'s own terms, to "permit an inference of … 'cross-price elasticity,'" *see id.* at 578.

For all of the foregoing reasons, under the pleading standards set forth in *Siva*, I think Plaintiffs' non-conclusory, factual allegations permit an inference that CMEs and MOCs are "reasonably interchangeable in the minds of relevant consumers." *See id.* at 578 (cleaned up). This is not a case "'with no reasonably founded hope' of success," *id.* at 575 (quoting *Twombly*, 550 U.S. at 559), where plaintiffs are attempting a "discover-first, plead-later approach," *Assoc. of Am. Physicians & Surgeons*, 15 F.4th at 835. Instead, as I see it, Plaintiffs' 51-page complaint sets forth sufficient factual allegations to carry Plaintiffs' heavy pleading burden.

### III.

The majority, however, finds that despite Plaintiffs' *Siva*-tailored amendments to their complaint, Plaintiffs still have not stated a claim upon which relief can be granted. In my view, the majority's concerns are mostly speculative and are improper bases for dismissal.

For example, the majority holds that because MOCs are more involved than CMEs, requiring PIP activities, article-based exams, and recertification exams, no psychiatrist or neurologist would view MOCs as interchangeable with CMEs. Maj. Op. 11. And the majority concludes that because of this "substantial cost in money, time, and effort," it "cannot infer" that if CME prices increased, sales would shift to MOC. *Id.*

But this case is about medical education products—which, as Plaintiffs explain, promote "individual, self-directed lifelong learning and the development of both medical and non-medical competencies"—not about widgets. There is no reason to believe, without the benefit of discovery, that because one manner of learning involves different sorts of assessments, or more assessments, or sometimes costs marginally more, there would be no market for it. How psychiatrists and neurologists might accomplish an "individual, self-directed" course of study is not something that we can discern or properly make guesses about at the motion to dismiss stage. After discovery, it is possible that Plaintiffs may not be able to prove their tying claim. But, at the motion to dismiss stage, drawing all reasonable factual inferences in Plaintiffs' favor and assuming the truth of their allegations, Plaintiffs have plausibly alleged that consumers would "voluntarily purchase MOC if given the option." *Siva*, 38 F.4th at 580; *see also In re Harley-Davidson Aftermarket Parts Marketing, Sales Practices & Antitrust Litig.*, 2025 WL 2374859 at *13–14 (7th Cir. Aug. 15, 2025) (Lee, J., concurring and dissenting in part) (noting the perils of substituting the court's own economic judgment for the allegations in the complaint in order to affirm dismissal of a plaintiff's tying claims); *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S.

232, 236 (1974)) ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'").

Because I think that Plaintiffs here complied with the pleading standards set forth in *Siva*, plausibly alleging that CMEs and MOCs are reasonably interchangeable, I would reverse the district court's dismissal of Plaintiffs' complaint so that discovery could proceed.